Espy v. Bank of Cincinnati.

A check drawn by S. & M. on the bank for $26.50, in favor of H., was raised to $3920, and the payee's name changed to E. H. & Co., and offered to the latter by a stranger in payment for bonds and gold purchased by him. E. H. & Co. sent the check for information to the bank, whose teller replied "It is good," or "It is all right." In a suit brought by the bank against E. H. & Co. a judgment was given for plaintiff. On error to this court it was *held*—

1. That where money is paid on a raised check by mistake, neither party being in fault, the general rule is that it may be recovered back as paid without consideration.

2. But that, if either party has been guilty of negligence or carelessness by which the other has been injured, the negligent party must bear the loss.

3. That where a party to whom such a check is offered sends it to the bank on which it is drawn for information, the law presumes that the bank has knowledge of the drawer's signature and of the state of his account, and it is responsible for what may be replied on these points.

4. That unless there is something in the terms in which information is asked that points the attention of the bank officer beyond these two matters, his response that the check is good will be limited to them, and will not extend to the genuineness of the filling-in of the check as to payee or amount.

5. *Quære:* Would the indorsement of the word "good," with the officer's initials, under such circumstances, make the bank liable beyond the genuineness of the signature and the possession of funds to meet the check as certified?

6. Where a check is certified for the purpose (known to the bank) of giving it credit for negotiation or circulation, to be used as money, and it is so passed into the hands of third persons, the bank would be bound, though the case might be otherwise when it was only certified to give the party presenting it assurance that it was good for his own satisfaction in taking it.

7. But a verbal reply that a check is good, given for the information of the party about to receive it, extends only to matters of which the bank had knowledge, or is presumed to have by the law, unless he is told that more extended information is expected or asked for as to the validity of the check.

ERROR to the Circuit Court for the Southern District of Ohio; the case being thus:

Stall & Meyer were grocers of Cincinnati, and kept a deposit account in the First National Bank there. Espy, Heidelbach & Co., were brokers in the same city, dealing in government bonds and gold. On the 26th of April, 1870, a well-looking stranger entered the office of these last, and proposed to purchase of them certain bonds and a specified quantity of gold. They agreed to sell both to him at a price named, $3920. He then told them that he would go to Stall & Meyer, with whom he represented that he had dealings, get their check for the amount, and return in about two hours. He went away and returned in about two hours with a check of Stall & Meyer, drawn apparently to the order of Espy, Heidelbach & Co., and for the sum of $3920, which he offered to them for the bonds and gold that he had bought. The firm sent one of their clerks, named Snarenberger, to the bank with directions to ascertain if the check was good, and to say that it was presented by a stranger. Snarenberger presented the check to the teller of the bank, a person named Sanford, who examined it, looked at the account of Stall & Meyer on the bank books, and said to Snarenberger, "It is good," or "It is all right" (the witnesses did not agree which), " send it through the clearing-house."

According to Snarenberger's account, he told Sanford that the check was offered by a stranger. Sanford denied that he was told this; but he asserted notwithstanding that he told Snarenberger that if the check was offered to Espy, Heidelbach & Co. by a stranger, he would advise them to have nothing to do with him, no matter how well-looking he was.

After this interview, examination, and answers, Snarenberger went back to the office of Espy, Heidelbach & Co., and informed them that the teller had said, "It is all right, send it through the clearing-house." They thereupon delivered to the stranger the bonds and the gold that he had contracted for, and he went his way and was no more heard of.

The check was put through the clearing-house and paid. But on the next day it was discovered that it was an altered or "raised" check; that the stranger had gone to Stall & Meyer professing to purchase some groceries for a Mrs. E. Hart; that having purchased $23.50 worth, he handed them a $50 bill in payment, asking them to pay him the difference, $26.50, by a check of their own, so that Mrs. Hart might see that he had taken no commission, which they accordingly did, the check being drawn to the order of Mrs. E. Hart; and that the stranger had very ingeniously altered the instrument by substituting as the sum to be paid $3920 instead of $26.50, and by substituting the name of Espy, Heidelbach & Co., for that of Mrs. E. Hart as payee.

Espy, Heidelbach & Co. not being willing to pay back the money got upon the check, the bank sued them in assumpsit to recover the amount improperly paid.

On the trial the plaintiff called one Goodman, who, having testified that he had been a banker in Cincinnati all his life, and was familiar with the customs and usages of banks and bankers there, was asked,

"When a check is sent by a bank, to which it is offered, to the bank upon which it is drawn, to know whether it is good or not, and the answer is, 'That is good,' or 'All right,' has that answer . . . acquired any peculiar or limited meaning? If so, state what that meaning is, and to what it is limited."

The court allowed the question under objection and exception, and the witness having testified that this language had acquired a peculiar or limited signification, and was understood to refer to the genuineness of the signature, and whether the money was in bank to meet the check; and on cross-examination, that he had never heard the meaning of the terms discussed, or any question made as to the same, or known of any transaction requiring a decision as to their meaning before April 26th, 1870,—and having further testified that the terms "It is good," or "It is all right; *send it through the clearing-house*," had not acquired any peculiar or limited meaning—the defendants moved to exclude the

answer given to the question last aforesaid, as incompetent and irrelevant, which motion the court overruled, and the defendants excepted.

Similar evidence from other witnesses was received, under objection and exception.

The plaintiff made ten requests for charges, including as a fifth and sixth, these two:

"*Fifth*. If the defendants, before receiving this check, sent their messenger to the plaintiffs' bank to examine the check carefully, and if it appears from the evidence that among bankers at that time such a request was understood to refer to the genuineness of the signature and state of the account, this inquiry must be presumed to be intended to refer to those parts of the check to which they had the means of giving accurate information, and nothing else; and if as to these matters true answers were given, and the plaintiffs' teller gave his honest judgment as to the general character of the check, and had no knowledge of and could not readily discover this alteration by an inspection of the check, then the plaintiffs are not estopped from recovering this money.

"*Sixth*. If at the time of this transaction the words 'good' or 'all right' among bankers was simply understood to refer to the genuineness of the signature and the state of the account, and the said words were so used and intended to be used by Mr. Sanford at that time when he said the check was 'good' or 'all right,' and if the said check had a fraudulent alteration, so skilfully done as not to be readily discovered by an inspection, and which was not known to either party at the time the said check was presented to Mr. Sanford, and if the signature of the check was genuine, and the account good, then the plaintiffs are not estopped from recovering the said money in this action by reason of the said answer given by Mr. Sanford."

The two, thus above given, were *refused.*

The defendants made eight requests for charges, including this one as a fourth, which the court *gave.*

"*Fourth*. A verbal certification of a check is equally valid with a written certification, and constitutes a contract, obligatory on the party giving the certification, the consideration of

which is the property parted with by the party receiving the certification on the faith of the certification."

The whole ten instructions requested by the plaintiff were given, with the exception of the fifth and sixth ones, quoted *supra*, p. 607, which two, as already said, were refused.

On the other hand, the eight instructions requested by the defendants were refused (or granted only in modified forms), with the exception of the fourth one, as above quoted.

To the grant of the eight requests of the plaintiff granted, and to the refusal (or grant only in modified forms) of the seven not granted or only so granted, and requested absolutely by the defendants, *the defendants* excepted.

However, neither the instructions which, at the plaintiff's request, were granted, nor those which in face of the defendants' request were denied, or granted only in modified forms, need here be set out; since the court, of its own motion, summed up (as this court considered) the substance of every instruction given at the request of the plaintiff, and of all its denials of requests by the defendants, in certain propositions made thus in a charge of its own:

"1. If the object of the defendants in sending the check to the plaintiff was to have them examine the same and pass upon the genuineness of the signature of the drawers, and the state of their account with them, and the plaintiff so understood their object, and returned to them the answer, that 'It is good,' or 'All right; send it through the clearing-house,' such answer would be a parol certification of the check, as to the genuineness of the signature, and that the drawers had funds in their hands to meet it, and the plaintiff by such parol certification would be estopped from denying either that the signature was genuine or that the drawers had funds to meet the check.

"2. If the defendants, in order to test the genuineness of the signature of the drawers, that they had funds in their hands to meet it, and to test its genuineness in all other respects, sent it to the plaintiff for inspection and examination, and the plaintiff, knowing the full extent of the object for which it was sent, sent back the reply, 'It is good,' or 'It is all right,' and if the defendants relied upon that answer, and were induced to act

upon it, and parted with their bonds and gold upon the assurance of the answer, the plaintiff will be estopped from setting up the fact that the check was a raised check.

"3. If the defendants had no suspicion of the check being a raised check, and sent the check to the plaintiff for the purpose of examination, without specifying the particulars to which they wished the examination directed, the plaintiff had a right to presume that such examination was desired in relation to such points of which the law presumed them to have knowledge, to wit, the genuineness of the drawers' signature, and the state of their account, and if in good faith they made examinations in regard to these points, and they had no knowledge of the raising of the check, or had no particular means not common to the defendants of knowing that it had been raised, their answer to the inquiry must be confined to the genuineness of the signature of the drawers and the state of their account, and cannot be extended as an assurance or guarantee that the check is not a raised check, and plaintiffs are not estopped from setting up such fact.

"4. If the defendants and the plaintiffs were mutually ignorant of the fact of the raising of the check, and neither party had any suspicion that it had been so raised, and the parties having within their power equal means of ascertaining that fact, the law did not impose upon the plaintiff more than upon the defendant the duty of calling upon the drawers to ascertain whether such check had been so raised, and if the plaintiff under such circumstances paid the amount of said check to the defendants, such payment is not an adoption of the check as genuine, and the plaintiffs are not bound by said payment, and are not estopped from showing that the check was so raised."

To the part three of these instructions the defendants excepted.

*Messrs. G. Hoadly and E. M. Johnson, for the plaintiff in error:*

I. *As to the admission of incompetent testimony.*

This consists of several particulars, among them may be mentioned the allowing Goodman to testify to a peculiar meaning attributed, by usage of Cincinnati bankers, to the words, "that is good," or "all right;" no one having pre-

tended that those were the words used; and he testifying that the words, which were in fact used,—"It is good," or "It is all right; *send it through the clearing-house,*"—had not acquired a peculiar meaning, and further, that before the day of the transaction in controversy, April 26, 1870, he had never known of a transaction requiring a decision as to the meaning of the words, "It is good," or "All right," and had never heard their meaning discussed, or any question made as to the same.

II. *As to the legal effect of the words used by plaintiff's teller to the defendants' messenger.*

Both parties agreed that the check was shown to Sanford; that he was the proper officer to certify checks, or furnish information of their value; that he knew it was offered to Espy, Heidelbach & Co., and that the offer was pending and undetermined, awaiting his reply; that he examined the check, and said, with the design of having the statement repeated to the defendants, and that they should act upon it, "It is good," or "All right," "send," or "put it through the clearing-house."

1. *These words constituted a verbal certification, equivalent in law to a written certification of the check.*

In the leading case of *Merchants' Bank* v. *State Bank,*[*] the form of certification adopted was,

"Good.     C. H. Smith, Cashier."

In *Meads, Receiver, &c.,* v. *The Merchants' Bank of Albany,*[†] the form adopted was,

"Good.     Kirtland, Teller."

Not only is the form of words thus used for written certification almost identical with those in the present case, but in essential meaning it is quite the same.   Both the written and spoken phrase assures the holder that the check, in the form in which it then appears, is good, and will be paid to the holder on presentation.   It is an engagement by the

---

[*] 10 Wallace, 604.          [†] 25 New York, 143.

bank, upon which will rest the duty of paying the check, that it will comply therewith.

Wherein does, or can the written "certificate of the bank that a check is good," differ, in legal effect, from the same certificate by parol? The form of words is the same; the consideration the same; the intent and meaning the same.

The authorities concur in holding a verbal certification equivalent to a written, or to acceptance.*

2. *Being equivalent to a written certification, the examination and statement of the teller constitute an original obligation, in the nature of an acceptance, which the certifying bank must comply with by payment, and cannot recover back after payment.*

In *Merchants' Bank* v. *State Bank,* this court says:

"The certification of a check, is an undertaking that the check is good then, and shall continue good, and this agreement is as binding on the bank as its notes of circulation, a certificate of deposit payable to the order of the depositor, or any other obligation it can assume. The object of certifying a check as regards both parties, is to enable the holder to use it as money. The transferee takes it with the same readiness and sense of security that he would take the notes of the bank. It is available also to him for all the purposes of money. Thus it continues to perform its important functions until in the course of business it goes back to the bank for redemption, and is extinguished by payment."

This authority is of course conclusive, and it is in full accord with the other decisions.†

3. *The certifying bank cannot escape its duty of payment, or, having paid, recover back the money, under pretence of a fraudulent alteration of the check before certification.*

---

* Robson v. Bennett, 2 Taunton, 388; Burnet v. Smith, 10 Foster, 256.

† Farmers' and Mechanics' Bank v. Butchers' and Drovers' Bank, 16 New York, 125; Barnes v. Ontario Bank, 19 Id. 159; The Girard Bank v. The Bank of Penn Township, 39 Pennsylvania State, 92; Bickford v. First National Bank of Chicago, 42 Illinois, 238; Brown v. Leckie et al., 43 Id. 497; Clarke National Bank v. Bank of Albion, 52 Barbour, 599; Salt Springs Bank v. Syracuse Savings Institution, 62 Id. 108–9.

Alteration *after* execution will discharge the maker or other party to a promissory note, bill of exchange, or check. But alteration *before* execution is quite different.

In *Sanderson* v. *Collman*,* Tindal, C. J., says:

"The first point in this case is whether the drawee, after accepting and thereby giving an apparent validity to a bill, has a right in an action against him as acceptor to set up as a defence that the name of the drawer was forged, *or other matter invalidating the bill.* And it appears to me that he has no such right."

In "assumpsit by the indorsee against the acceptor of a bill of exchange, the plea was that before the bill became due, and whilst it was 'in full force and effect,' the date of it was altered by the drawer, whereby it became void: *Held*, that the plea was bad, because it did not allege the alteration to have been made *after* acceptance."†

In *Ward* v. *Allen*,‡ the court say:

"It is no defence to an action by a *bona fide* holder of a bill of exchange against the acceptor, that the bill was fraudulently altered before acceptance."

It seems clear from these considerations and authorities, that the theory of law applied to the case by the court below was founded in error.

III. *As to the plaintiff's supposed right to recover for money paid by mistake.*

It is obvious that this right does not extend to every case of mistake. At law, the right to recover money paid by mistake is limited to the cases where no consideration passed.§ In the case at bar, there was a consideration; the consideration consisting of the detriment to the defendant in receiving the check, and delivering the gold and bonds, upon the faith of the plaintiff's representation that the

---

* 4 Manning & Granger, 218.

† Langton *v.* Lazarus, 5 Meeson & Welsby, 629.          ‡ 2 Metcalf, 53.

§ Hoffman *v.* Bank of Milwaukee, 12 Wallace, 181; Ellis & Morton *v.* Ohio Life Insurance and Trust Co., 4 Ohio State, 628; Koontz *v.* Central National Bank, 51 Missouri, 279.

check was good, and its promise to pay at the clearing-house.

In equity, a complainant seeking to set aside and cancel a transaction, and recover moneys paid or other property transferred or conveyed, can succeed only on condition that he replace the defendant in *statu quo*, by returning him the consideration he parted with. If part of.this consideration consists of money paid at the complainant's instance to a third person, that money must be restored, as a condition of decree.

This rule is recognized even at law, in Pennsylvania. Chief Justice Gibson in *Boas* v. *Updegrove*,* states it thus:

"Money voluntarily paid by mistake cannot be recovered back where the parties cannot be placed in *statu quo;* for where the blunder necessarily imposes a loss on some one, it must be borne by the author of it."

Who was the author? Certainly no one but the plaintiff, whose teller, after careful inspection of the check, replied, "The check is good, or all right; send it through the clearing-house." Upon the faith of this representation and promise the defendants parted with their gold and bonds. Return the value of this gold and bonds, or cease to press for a rescission of the dealings between the parties.

Concede that the whole matter was a blunder, that both parties were equally ignorant, and that neither of them suspected, or could have discovered it was a raised check, the first blunderer was the plaintiff, and therefore it was in law the author of the blunder. This principle was recognized and enforced in the *Irving Bank* v. *Wetherald.*†

IV. *The plaintiff is estopped in pais to dispute its liability upon the acceptance.*

A case quite similar to that under discussion was disposed of in Alabama by the principle of estoppel.‡ The court say:

"If the maker of a promissory note tells one seeking to

---

\* 5 Pennsylvania State, 518.    † 36 New York, 335.

‡ Brooks *v.* Martin, 43 Alabama, 360.

trade for it, and desirous to know if he has any defence against it that it is ' all right,' he will not be permitted afterwards to dispute this admission when sued on the note by the party to whom the admission was made."

The principle of estoppel in pais was thus stated by Lord Denman in *Pickard* v. *Sears.*\*

" Where one by his words or conduct wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time."

The word " wilfully " as here used has since been construed to mean " voluntarily :"†

Had Sanford refused to answer, or said, " Inquire of Stall & Meyer," or, " The amount stands to their credit, and the signature is genuine," there would have been no dispute. He chose not thus to limit his assurance, but preferred rather the enlarged statement, " the check is good;" not " the signature and amount," but " the *check* is good, or *all* right; send it through the clearing-house." Thus he created the possibility of injury, giving to the stranger the opportunity of fraud, and his principal should bear the loss.

*Mr. T. D. Lincoln, contra.*

Mr. Justice MILLER delivered the opinion of the court.

Stall & Meyer, customers and depositors with the First National Bank of Cincinnati, made their check on that bank for the sum of $26.50, payable to the order of Mrs. E. Hart, and delivered it to a stranger to all the parties to the transaction, out of which this controversy arose. This man erased the name of the payee and the amount for

---

\* 6 Adolphus & Ellis, 475.

† Cornish *v.* Abington, 4 Hurlstone & Norman, 549; and see Dezell *v.* Odell, 3 Hill, 215; Eldred *v.* Hazlett's Administrator, 33 Pennsylvania State, 309; and Weaver *v.* Lynch, 25 Id. 451; Buchanan *v.* Moore, 13 Sergeant & Rawle, 306; Jorden *v.* Money, 5 House of Lords Cases, 212

which it was given and inserted the name of Espy, Heidelbach & Co., bankers and brokers, and also the sum of $3920, and passed it to Espy, Heidelbach & Co., in payment of bonds and gold which he purchased from them. The check was paid by the bank through the clearing-house, and the next day the fraud was discovered, and the bank made a demand on Espy, Heidelbach & Co., for the amount· as paid through a mistake.

If this were all the case there could be no doubt of their right to recover. The principle that money so paid under a mistake of the facts of the case can be recovered back is well settled, and in the case of raised or altered checks so paid by banks on which they were drawn there are numerous well-considered cases where the right to recover has been established, when neither the party receiving nor the party paying has been in any fault or blame in the matter. Of course if there is fault on the part of the party receiving pay for such a check it strengthens the right of recovery.

But in the case before us the rights of the parties are to be determined by what took place between themselves before the check was paid. It appears by the bill of exceptions that the man who perpetrated the fraud, having ascertained from Espy, Heidelbach & Co. the price of the bonds and gold which he proposed to buy of them, told them that he had dealings with Stall & Meyer and would get their check for the amount, and after an absence of two or three hours returned with the check in question. Not wishing to take it from this stranger without further information, they sent Mr. Snarenberger, one of their clerks, to the bank with instructions to ascertain if the check was good, and to say that it was presented by a stranger. Snarenberger presented it to Mr. Sanford, the proper officer of the bank, who, after examining the check and the state of Stall & Meyer's account, said, "It is good," or "It is all right; send it through the clearing-house."

There is a slight disagreement between Snarenberger and Sanford as to the precise words used, but we do not deem the difference of any importance. But there is difference in

another point between these two, which with the jury might have had some weight. Snarenberger testifies that he told Sanford that the check was offered to his house by a stranger, which Sanford denies; and Sanford says that he told Snarenberger that if the check was offered by a stranger he would advise them to have nothing to do with him; that he would be careful and not pay so large a check to a stranger, no matter how good-looking he was.

On the return of Snarenberger, Espy, Heidelbach & Co. delivered the bonds and gold to the stranger and received the check in payment, and in the language of the record the stranger went his way and was heard of no more. Espy, Heidelbach & Co. indorsed the check, and it was paid, as stated already, through the clearing-house.

In a suit brought by the bank to recover the money it had a judgment, to reverse which this suit is brought.

The defendants excepted to the admission of certain testimony given by the plaintiffs on the trial for the purpose of proving that the words "all right," "it is good," when used in reference to a check presented at the bank on which it is drawn, had, by the custom and usages of the bankers of Cincinnati, acquired a limited and well-understood meaning, namely, that it had reference exclusively to the genuineness of the drawer's signature and to the state of his account at the bank. The objections made to this evidence were that in its nature it was inadmissible; that the person testifying showed his want of knowledge on the subject, and that the expressions "all right" and "it is good" were not the precise expressions used. But we need not inquire whether the court was right in admitting this testimony, because in the subsequent progress of the trial it became immaterial. The court refused to charge the jury, as requested by the plaintiffs in their fifth and sixth prayers, that if there was such an understanding among bankers as to the use of the terms mentioned, it limited the responsibility of the bank to these two matters; and in the charge of the court of its own motion it placed the case beyond the influence of such testimony, by instructing the jury that as matter of law such

was the effect of the words supposed, when used under the circumstances suggested by the interrogations of plaintiff's counsel in regard to the understanding of them among bankers.

We are relieved also, by an attentive consideration of the instructions given by the court, from another very grave question much discussed by counsel in this court, that is, whether a verbal statement by the proper officer to certify checks that the one presented is good, is, or is not, the equivalent of a written certification of the check in the usual manner. For the fourth instruction asked by the defendants and granted by the court is precisely what is claimed by counsel here as to the effect of such verbal statement, as will be seen at once by its inspection. It is as follows: "A verbal certification of a check is equally valid with a written certification, and constitutes a contract obligatory on the party giving the certification, the consideration of which is the property parted with by the party receiving the certification on the faith of the certification." The plaintiff in error, against whom the jury rendered their verdict, notwithstanding the instruction thus given, must be held to have had the benefit of the principle thus asserted with the jury, whether the court was right in giving it or not.

The plaintiffs on the trial below prayed ten distinct instructions to the jury, all of which were granted except the fifth and sixth, which we have considered. The defendants prayed eight instructions, all of which were refused or modified except the fourth, to which attention has just been called. Upon all these rulings of the court as well as upon the charge of the court of its own motion, errors are assigned.

But we are of opinion that the whole case turns upon the latter charge of the court. This consisted of four distinct propositions:

1. That if defendants below sent the check to the bank for the purpose of having the latter pass upon the genuineness of the signature and the state of the account of the drawer, the statement that it was good, or all right, would

estop them from denying that the signature was genuine, and there were funds to meet it.

2. If defendants sent the check for the purpose of testing the genuineness of the signature of the drawers, the state of their account, and to test its genuineness in all other respects, and plaintiff knowing the full extent of the object for which it was sent, replied "It is good," or "It is all right," plaintiff is estopped to set up that the check was raised.

3. That if the defendants had no suspicion that the check was raised, and sent it to plaintiffs for examination without specifying the particulars to which they wished the examination directed, the plaintiffs had a right to presume that it was desired in relation to such points as the law presumed them to have knowledge, namely, the genuineness of the drawer's signature and the state of his account, and if they answered in good faith and had no means other than those of defendants of knowing that the check was raised, they were not estopped from setting up that fact.

4. That if the parties were mutually ignorant and unsuspicious concerning the check being raised, the law did not impose upon plaintiffs more than the defendants, the duty of calling on the drawers for information on that subject.

The plaintiffs in error, defendants below, can have no cause to complain of the first and second proposition laid down by the court below.

If the bank officers had their attention turned to the matter of the raising of the check, or even had notice that in applying to them for information the parties presenting it did so for the purpose of getting information which would include that subject, they could have limited their general statement that it was good so as to exclude its application to that point, or might have declined answering altogether. If, with this notice, says the court, they gave a general statement that the check was good, or all right, these words must be held to have reference to all the matters on which they knew that the other party asked or desired their opinion. Unless we are prepared to hold to the fullest extent the principle asserted by the plaintiffs in error, that the

general statement that the check is good binds the party making it as to everything connected with its validity, this charge of the court is as favorable to them as it should have been, and is only doubtful as it militates against the bank.

We think it is equally clear on principle that there was no error in the fourth proposition of the court. Undoubtedly, where there exists a suspicion that the check has been altered in the amount, or in the name of the payee, the proper party to be inquired of is the maker of the check. He and he alone has the means of settling that question conclusively. The bank, as a general rule, can know this no better than the party to whom it is presented for negotiation. It is the latter who first parts with his money or property on the faith of the check, and he is as much bound to diligent inquiry on that question as the bank. The latter is held by the law to know the drawer's signature and the state of his account. He is no more bound to know or to answer beyond these two matters than the party who presents it for information. So if there be no suspicion of the fraud in raising the check, the parties are equally innocent, and no question of the relative degree of diligence in making inquiry on that subject arises between them. This is certainly true unless the bank, if it consents to give any information at all about the validity of the check, is bound to answer as to everything which may affect its validity. As this contention is the turning-point of the case and is the one which is responded to in the third of the propositions laid down by the court, we turn now to consider that.

This assumes that neither party had any suspicion that the check was raised and that no special reference was made to that point in the inquiry of the defendants below. It is also to be considered that the bank was not asked to certify it in the usual way by indorsing it as good, and that the party who asked information was the one whose name was in the check as payee. We do not propose to decide here what would have been the legal effect in the present case if the bank officer had, under precisely these circumstances,

been requested to indorse the check as good, and had done so, affixing his name or his initials in the ordinary way.

The strong argument of the plaintiff in error is that such an indorsement would bind the bank for the entire validity of the check, and that what was said verbally by Sanford was the legal equivalent of such an indorsement. If this latter point were conceded no case precisely in point has been produced where this would be held to bind the bank under the circumstances of the present case. The authorities relied on are mainly acceptances of drafts or bills of exchange; and it is the same class of cases that are relied on to show that a verbal acceptance, or promise to accept, is equivalent to a written acceptance. The highest courts in this country and England have regretted the decisions which gave original sanction to this latter proposition.*

Bank checks are not bills of exchange, and though the rules applicable to each are in many respects the same, they differ in important particulars.† Among these particulars is that a check is drawn against funds on deposit with the banker, and the indorsement that it is good implies that when the indorsement is made there were funds there to pay it. A bill of exchange is not drawn on such deposits necessarily, and its acceptance raises no implication that the drawer has such funds to meet it. It is a new promise by the acceptor to pay, funds or no funds. In both cases the bank is supposed to know the signature of its correspondent, and cannot, after indorsing it as good or accepted, dispute the signature. But as one of the main elements of utility in a bill of exchange is that it shall circulate freely, and it may thus pass through many hands on the faith of the acceptor's signature, it may possibly be that he should be responsible for the promise contained in it, as it came from his hands, for it was drawn on no special fund, and the possession of such fund by him does not affect his liability. By such acceptance he becomes primarily liable, as if he were

---

\* Boyce *v.* Edwards, 4 Peters, 122; Johnson *v.* Collings, 1 East, 103.

† Merchants' Bank *v.* State Bank, 10 Wallace, 647.

the maker of a promissory note.  How far these reasons should be applied to a certification that a check was good seems extremely doubtful, both on principle and authority. Where the object is to use the indorsement to put the check in circulation, or raise money on it, or use it as money, and this object is known to the certifying bank, it may be argued with some force that the bank should, as in the case of an acceptance of a bill of exchange, be held responsible for the validity of the check as it came from the hands of the certifying bank.   Such a rule would seem to be just when checks are certified, as we know they often are, without reference to the presence of funds by the drawer, and when the well-known purpose is to give the drawer a credit by enabling him to use the check as money by putting it in circulation.

But such a verbal statement as was made in the present case cannot come within that principle.   There was no design or intent on the part of the bank to assume a responsibility beyond the funds of the drawer in their hands, nor to enable the payee of the check to put it into circulation. Nothing was said or done by the bank officer which could be transferred with the check as part of it to an innocent taker of it from the payee.   Such subsequent taker would have no right to rely on what was said by the bank officers, any further than the payee would.

We are of opinion that the court was entirely right in treating the case as one in which information was sought and obtained by Espy, Heidelbach & Co. for their own use, and to govern their own action.   For such information as the bank was willing to give, and did give, it was, no doubt, responsible, because it had reason to believe that the other party would act upon it.   But only to this extent and only on this principle is it liable.   It is not liable as for accepting or indorsing a draft or check with intent that it might go upon the market for general use and negotiation with the credit of its name attached to the paper, just as it was placed on the market.

Under these circumstances we are of opinion that the Circuit Court was right in holding that in the absence of any-

thing tending to direct his attention to other matters, the bank officer had a right to suppose that information was desired of him only in regard to the signature of the drawers and the state of their account. These were material facts to be known, which both common sense and commercial law presumed to be within his knowledge. The answer he gave that the check was good or was all right must be supposed to be responsive only to these two points. The genuineness of the payee's name and of the sum filled in the body of the check were as well known and as easily ascertainable by the payees themselves as by the bank officer, and unless the inquiry was so framed as to call his attention to these points, he had no reason to suppose, in the nature of the transaction, that he was expected to give information in regard to them. So the response of "good" should not on sound principle be held to extend to them. He was under no moral or legal obligation to give an opinion on these points. He had no reason to suppose that he was asked for such an opinion, and because he did give an opinion that the check was good in the only points of which he knew anything, it would be illogical to hold the bank liable on the ground that the response meant good absolutely and for all purposes.

The court told the jury very clearly that if the bank officer had any reason to believe that the defendants were seeking information in regard to the general validity of the check, or if they had been asked any question which related to the genuineness of the check as to amount or the names of the payees, his statement that it was all right would bind the bank. This was as far as the court ought to have gone in that direction, for they were not bound to answer such a question, nor, as we have already said, does the law or the nature of the business imply that they had any superior information on these points to that which the defendants had.

The case was certainly very fairly put before the jury, so far as the rights of the plaintiffs in error are concerned, if the views here advanced are sound, and the judgment must be

AFFIRMED.