WILKIN W. FEGAN *vs.* THE GREAT NORTHERN RAILWAY COMPANY.

Opinion filed November 3, 1899.

**Payment By Mistake—Negligence.**

> In an action to recover money paid under a mutual mistake of fact, where it appears that the plaintiff prior to and at the time of paying over the money had in his hands the present means of ascertaining whether or not the fact in question existed, but negligently omitted to make the investigation, which, if made, would have discovered the fact in question, and where the further fact appears that on account of such negligence of the plaintiff the defendant lost a valuable right, and that the defendant cannot be placed in statu quo, the plaintiff cannot recover.

**Negligent Failure to Examine Account—Money Paid Under Mistake of Fact—Estoppel.**

> In such actions the plaintiff cannot recover when, in equity and good conscience, he ought not to recover. Applying these rules of law to the facts stated in the opinion in this case, it is *held* that the judgment of the District Court dismissing the action was properly entered, and must be affirmed.

Appeal from District Court, Grand Forks County; *Glaspell,* J.

Action by Wilkin W. Fegan against the Great Northern Railway company. Judgment for defendant, and plaintiff appeals.

Affirmed.

*Bosard & Bosard,* for appellant.

A payment made under belief of a liability, which did not exist in fact, is not voluntary, and the money may be recovered back, though the mistake might have been avoided if greater care had been taken to investigate and ascertain the facts regarding the transaction. *United States* v. *Barlow,* 132 U. S. 271-282; *Brown* v. *Tillinghast,* 84 Fed. Rep. 71; *Wheadon* v. *Olds,* 20 Wend. 174; *Clark* v. *Sylvester,* 13 Atl. Rep. 404; *United States* v. *Bank,* 39 Fed. Rep. 359; *Holmes* v. *Lucas Co.* 53, Ia. 211; *National Life Ins. Co.* v. *Jones,* 59 N. Y. 649; *Fraker* v. *Little,* 36 Am. Rep. 262.

*W. E. Dodge,* for respondent.

The payment by plaintiff was a voluntary one in settlement of a bona fide claim arising out of plaintiff's misconduct and the misconduct of his agent Stewart. It was made with full knowledge of the facts or the means of ascertaining them by consulting records in his possession. Plaintiff has profited by such payment and by his negligence has made it impossible to place defendant in a position of *statu quo. Espy* v. *First Nat. Bank,* 18 Wall. 604; *Boas* v. *Updegrove,* 5 Pa. St. 516, 47 Am. Dec. 425; *Smith* v. *Schroeder,* 15 Minn. 18; *Morton* v. *Marden,* 15 Me. 45, 32 Am. Dec. 132; *Welch* v. *Carter,* 1 Wend. 185; *Mowatt* v. *Wright,* 1 Wend. 355; *Bilbie* v. *Lumley,* 2 East. 470; *McArthur* v. *Luce,* 5 N. W. Rep. 355; *Robinson* v. *Charleston,* 45 Am. Dec. 739. The same rule obtains in tax cases. Cooley on Tax'n, 2d Ed. 476,

553; 2 Desty Tax'n, 850; *Lynde* v. *Melrose,* 10 Allen 49; *Brevort* v. *Brooklyn,* 89 N. Y. 135; *Waples* v. *United States,* 110 U. S. 630; *Flint* v. *Comm's'rs,* 27 Fed. Rep. 850; *Tyler* v. *Cass Co.* 1 N. D. 369; *Detroit Advertiser* v. *Detroit,* 5 N. W. Rep. 72; *County of Wayne* v. *Randall,* 5 N. W. Rep. 75.

WALLIN, J. This action was tried in the District Court without a jury, and judgment was entered in that court dismissing the action. None of the findings of fact are challenged in this court, but the appellant claims here that the conclusions of law and the judgment are unwarranted by the facts as found. It appears that this action is for money had and received, and is brought to recover $904.83, with interest after July 1, 1895, which principal sum plaintiff claims was paid by him to the defendant under a mistake of fact. The fact of such payment is not in dispute, and the findings show that the same was made under the following circumstances: On November 1, 1894, the plaintiff became the station agent of the defendant at its station at Grand Forks, N. D., and on that day took charge of said station, and the property and business appertaining thereto. When plaintiff was installed as station agent, and long prior thereto, one Daniel S. Stewart had been in the employ of the defendant at said station as cashier of the station, and plaintiff continued Stewart in that capacity. It appears that said station, when plaintiff was installed, was short in its accounts with the defendant, and when plaintiff assumed charge certain waybills and other items of account were suppressed, and did not appear in the transfer of the station to the plaintiff. The sum total of the suppressed accounts exceeded the sum of $5,000. Later, and prior to July 1, 1895, these suppressed waybills and accounts were by said Daniel S. Stewart, and without plaintiff's actual knowledge, brought into the accounts of said station, whereby it appeared that the funds of the defendant had been misappropriated and diverted from the defendant while plaintiff had been in charge of the station. It appears that on or about the date last named the defendant represented to the plaintiff the fact that he was short in his accounts with defendant, and represented to plaintiff that said Stewart had, since the plaintiff had assumed charge of said station, collected moneys belonging to the defendant, and misappropriated the same, and diverted them to other purposes than payment to the defendant, to an amount exceeding $2,900. The trial court found as follows:

"For the protection of the defendant against the misappropriation of moneys at said station the said defendant had caused the plaintiff herein to be bonded in a company organized and operated for such purpose in the sum of four thousand ($4,000.00), and had, on or about the 1st day of October, 1894, caused the said Daniel S. Stewart to be also bonded in said company in the sum of two thousand ($2,000.00) dollars. It is the practice and custom of the defendant, when a loss is covered by the bonds of two or more employes, to proceed against the bond securing the larger sum,

and thereupon the defendant notified and informed the plaintiff herein that unless the said moneys which had been so misappropriated were replaced and repaid to the defendant at once, that the defendant would proceed upon the bond of the said Fegan for indemnity on account of the said loss; and the said defendant also at the same time advised the plaintiff that they could not proceed upon the bond of the said Stewart, as the amount of the loss was greater than the amount for which the said Stewart was bonded, but, if the said Fegan would pay the overplus, or the amount of the said damage in excess of the amount for which the said Stewart was bonded, to-wit, the amount of nine hundred four and 83-100 dollars ($904.83), then, and in that case, the defendant would not proceed upon the bond given for the plaintiff, but would proceed upon the bond given for the said Stewart. At that time the plaintiff herein believed that the said moneys were so misappropriated and diverted during the term of the plaintiff's agency at the said station aforesaid, and while said station was under his direction and control, and that he was liable therefor; and the said Great Northern Railway Company also believed at that time that the said misappropriation had occurred during the plaintiff's term, and that he was liable to them for said amount; and in such belief the plaintiff, on or about the 31st day of July, 1895, paid to the defendant the said sum of nine hundred four and 83-100 dollars ($904.83); and the said defendant, so believing that the said plaintiff was liable for the payment of the said sum, received from the plaintiff the said sum of nine hundred four and 83-100 dollars ($904.83). * * * The said shortage and misappropriation of funds of the said defendant had, in fact, occurred before the 1st day of November, 1894, and long before the plaintiff had been appointed agent of said company at said station; but the plaintiff did not know such fact until long after the payment of said money, and as soon as he was notified of the fact that the said misappropriation of said moneys had occurred before the 1st of November, 1894, and that he was not liable therefor, he immediately demanded from the defendant repayment of said sum of eight hundred and eight and 26-100 ($808.26) dollars, being the balance of said nine hundred four and 83-100 ($904.83) dollars, the sum paid by him, after allowing the credit of ninety-six and 57-100 (96.57) dollars; but the defendant has refused to pay the same. All the moneys collected at said station during the term the plaintiff was agent at said station, and all the property that was received at said station during the time the plaintiff was the agent thereof, have been fully accounted for and paid over to the said defendant, and the said plaintiff was not indebted to the said defendant on the said 31st day of July, 1895, in the said sum of nine hundred four and 83-100 ($904.83) dollars, or in any other sum whatever. * * *

"The duties of the plaintiff, as such agent, were to exercise (subject to the supervision and direction of his principal) exclusive control and supervision over defendant's business at Grand Forks

station, but plaintiff could not and was not expected to perform all labor in the conduct of the business of the station personally, or to personally verify every item of business. He was, under the rules of the company, of which he had due notice and knowlege, responsible for all business transacted by the defendant as such agent. The defendant knew, officially, no other employe at said station. There were printed and written rules promulgated by the defendant, of which the plaintiff had due notice and knowledge at all times during his employment, which, in addition to the general custom of doing business, regulated his conduct. These rules have been in force since 1891, and are still in force. Rule 36 provides as follows: 'No agent is authorized to give credit; charges are invariably payable on delivery; and agents will in no case deliver freight until receipted for by the consignee, or his agent, nor deliver part of a consignment without first collecting charges on the whole.' * * * Rule 37 provides as follows: 'Agents will be held responsible for the safe-keeping of freight received by them, and for all charges thereon.' Another rule, duly proven by defendant, provides as follows: 'Remit Daily. Keep no money on hand excepting working fund. Remit the exact amount in excess of working fund provided in advance. Before taking credit on your cash book for remittances, you are required to have the amount definitely ascertained and inclosed in a proper envelope, sealed, and then make your cash-book entry, and forward the remittance by first express. Daily and monthly balance sheets must show the amount remitted to the treasurer and any bank; also the date of the remittance.' The term 'working fund' referred to a certain amount of money kept on hand for making change. The plaintiff, as agent, was required in every instance to ascertain the exact amount due the company, and then remit it, and these facts could be ascertained by every agent, including the plaintiff. The plaintiff was required at the end of every month, before he signed his balance sheet, to see that it was correct, and then sign it personally; to see that the freight receipt book corresponded with the abstract; to check the remittance as shown by the express receipt book against the items shown on the balance sheet; to see that they were properly made. These items were listed in detail, and showed the balance of account. The plaintiff was required, and it was his duty, to see that the uncollected list was correct. In order to check up his uncollected list, he was required to ascertain what cars were in the yard, and see that they corresponded with the uncollected list. It was his duty to ascertain that fact, and see that the business of the station was properly conducted; and from the records in his office it was possible for him to ascertain to a certainty the cash actually received at the end of each month. It was possible and practicable for the plaintiff, within eight days after he entered upon his duties, and at all times thereinafter during his term of office, to ascertain

from the records in his office whether there had been any defalcation on the part of his cashier before November 1, 1894, or at any time thereafter, by verifying his uncollected list. If he had checked up his accounts, as required by the customs and rules of the company, he could and would have ascertained the fact at the time when it occurred. Each agent at every station was required to make a waybill for each car, stating where it was destined, to whom consigned, and the rate of charges. The auditing department of the defendant had the same opportunity of discovering any shortage as had the plaintiff, and it was more particularly the duty of said department to do so; that being the object and province of said department. . Defendant's accounts with its agents were not always closed on the last day of the month, but held usually two days, to take in waybills due in the current month, so as to keep the transient as small as possible. Plaintiff could at all times, when he made his monthly reports have ascertained whether or not the amount due for freight according to his records had been collected, by making an inquiry of the consignees. The car records at his station would have shown whether or not the car had been emptied and sent away. This was part of the plaintiff's duty. He should have ascertained and reported, and his car record should have shown, these facts in every instance. These car records, as far as the freight and traffic department was concerned, were kept by the plaintiff exclusively at his station, and the plaintiff was required to report every car received, when empty, and when removed from their station, and keep a written record thereof at his station. It was his duty to know when cars came in, when they departed, and make a record, and report to the defendant any and all money collected for freight received at his station. Any money not remitted should have been in his possession. The station agent's reports were the only means by which the defendant could or did receive this information. The cashier, Mr. Stewart, was in every respect the servant of the plaintiff, who had authority to employ, superintend, direct, and discharge him, or any cashier at his station, at will; and such cashiers acted under the exclusive supervision and control of the agents at whose stations they served. Such cashiers only had access to the books, records, and papers of the defendant by permission of the agent, and never to the exclusion of the agent. Such matters were left entirely to the discretion of the agent.

"The defendant had a traveling auditor, whose duty it was exclusively to check up the accounts of defendant's station agents, including those of the plaintiff, but he was not requested, directed or required to investigate as to whether or not bills had in fact been paid by the consignees. He was governed by the records kept by the station agents only so far as they go. They are not conclusive. His duty is to thoroughly check the station up, and to find its true condition, and it was the duty of the station agents to ascertain the facts as to whether or not such collections had been made, and the money remitted. All of the station agents, including

the defendant's agent at Grand Forks (the plaintiff), were bonded by the Guaranty Company of North America to indemnify the defendant for any damage which it might sustain by reason of their negligence, mistakes, or defalcation. Such bond covered all agents who were held responsible to the defendant for all business transactions at their several stations. Since the date of said Stewart's employment as cashier at said Grand Forks station, prior to November 1, 1894, and the date of his discharge, June 1, 1895, moneys were received at said Grand Forks station on account of freight charges, which were never properly accounted for to the defendant, in divers sums, aggregating $2,904.83. The embezzlement of these funds was accomplished as follows: Bills against consignees were rendered at said station, and were duly collected, after which the same were reported to the defendant upon the monthly balance sheet as 'uncollected,' and the amounts so collected were not remitted to the defendant or its treasurer, as required by the customs and rules of the company, or otherwise, except as hereinafter stated. This practice continued from month to month. A portion of the money collected each month was remitted by the agent at said station as having been collected in payment of uncollected freight bills for the previous month, when in truth and in fact said alleged uncollected bills had been collected, and the money received by said agent or his cashier, and the amounts so received were held from defendant, and not remitted to it. The October balance sheet, made and certified to by plaintiff as agent at Grand Forks station on November 8, 1894, shows items aggregating $1,049.65 as having been collected after November 1, 1894, while in truth and in fact all said moneys had been collected and received by the said Stewart prior to November, 1894. The same items appeared on the balance sheet for the preceding month as 'uncollected,' while in truth and in fact the amounts had been collected. The plaintiff might have ascertained these facts from an inspection of the station records, or on inquiry from the consignee subsequent to making his October balance sheet, and under the rules of the company he was required to do so; but it was particularly the duty of the traveling auditor to have discovered this shortage at or about the time Mr. Fegan was checked into the Grand Forks station. The plaintiff's attention was called to this and other irregularities in his accounts in February, 1895, by letter written and addressed to him by the auditor of freight receipts, an officer of the defendant, and plaintiff's superior officer; whereupon plaintiff acknowledged such irregularities, and promised to discharge his cashier, Stewart. On February 28, 1895, plaintiff wrote his superior officer, Mr. F. E. Draper, auditor of freight receipts for the defendant, as follows: 'I do not like the way things have been running here in holding waybills, and am going to break it up.' He did not, however, change his cashier (Stewart), and he was not discharged until about June 1, 1895. And on March 17, 1895, plaintiff wrote his superior officer, said auditor of freight receipts, as follows: 'A few days ago I wrote you that

I would change cashiers on the first inst. I have changed my mind, and will keep Mr. Stewart.' Plaintiff was advised and had knowledge of irregularities in the conduct of said station in February, 1895, but not of any embezzlement of money of defendant. The evidence does not show that he knew the aggregate amount or number of items of collected freight reported as uncollected, but it does show conclusively that he might easily have ascertained these facts had he complied with the rules of the defendant, and made investigation, as hereinbefore described, and as conclusively that the defendant had the same opportunity. Had the plaintiff, in compliance with the rules of the company, and his duties in the premises, ascertained and reported these facts at any time within six months after November 1, 1894, the defndant might have reimbursed itself for that portion of the defalcation embezzled prior to July 1, 1894, upon the bond of the predecessor of the plaintiff, who was the agent of the defendant prior to November 1, 1894 ,and who was also bonded for a similar amount in the Guaranty Company of North America, but after the expiration of said six months after November 1, 1894, it became impossible for the defendant to do so by reason of the limitation of said bond. So, also, had the defendant's traveling auditor properly discharged his duty in checking plaintiff into the Grand Forks station. A large sum of money, amounting to more than $1,000, was collected by the plaintiff or his said cashier at said Grand Forks station after November 1, 1894, and remitted to the defendant as for collections made prior to November 1, 1894, while the several bills so collected were after-were reported by the plaintiff on his monthly balance sheet to the defendant as 'uncollected freight bills.' These facts the plaintiff might have ascertained had he seen fit to examine the records in his custody, check up the freight bills, and ascertain from consignee whether or not the same had been paid, as hereinbefore recited, and it was the province and duty of defendant's auditing department to discover these irregularities. Defendant's 'auditor of freight receipts,' Mr. F. E. Draper, requested the plaintiff to make the accounts good at his station by adjustment in the same manner as all other agents of the defendant, stating that plaintiff would be held responsible for the shortages. The plaintiff inquired of said Draper how he should proceed. Mr. Draper informed him that, in case the account was not made good, the company would make the collection on the bond of the plaintiff, because its agents were bonded for the correct workings of the stations. Plaintiff then inquired and requested the defendant to make collection from the Guaranty Company under the bond of his cashier, Mr. Stewart, as far as it would cover the same. Mr. Draper informed him that the company would be glad to do that. The plaintiff then inquired if he thought the Guaranty ompany would remain on his bond if such action was taken, whereupon Mr. Draper informed him that he did not know. The matter then remained in abeyance, after which

the plaintiff remitted to the defendant the sum of $904.83, being the difference between said sum of $2,904.83, the aggregate amount of said defalcation, and the sum of $2,000, collected from the Guaranty Company under the bond of said Stewart. This payment was made in compliance with the voluntary request of the plaintiff that settlement and final determination of that matter be made in that manner, and was in all respects according to the election of the plaintiff, and in accordance with his supposed legal liability, and to protect his character and credit, after the receipt of numerous letters from Mr. Draper requesting the payment. The plaintiff stated to Mr. Draper, defendant's auditor of freight receipts, that it would be a reflection upon his record to have the demand made under his bond, which reflection he wished to avoid, and he himself requested that the adjustment be made in the manner in which it was, under which arrangement said sum of money was paid by the plaintiff to the defendant."

We have, despite their prolixity, set out the principal facts as found by the trial court with great fullness of detail, to the end that the grounds upon which we rest our decision may be fully and distinctly indicated in the opinion. As a conclusion of law the trial court found as follows: "The plaintiff is estopped by his own negligence from claiming that the money paid the defendant, as alleged in his complaint, was so paid under a mistake of fact. He might, without difficulty, have ascertained the true facts before making payment, and he permitted an unreasonable period of time to elapse after he could have discovered the facts, so that the position and legal rights of defendant have been altered, making it impossible that the parties can be placed in '*statu quo.*'" It is our opinion that this conclusion of the trial court is sound in law, and is fully warranted by the facts of the case. Appellant's counsel lay stress upon the fact that it appears that all money and property which came into the hands of the plaintiff as such station agent was accounted for and paid over to the defendant. Upon this finding counsel argue that the plaintiff could not have been prosecuted criminally for the embezzlement of any money or property so paid over and accounted for. If this were conceded,—and we think it should be, under the circumstances of this case,—it by no means follows that plaintiff can recover of the defendant the money sued for, which was voluntarily paid over to extinguish a bona fide claim which the defendant then had, and one arising out of the business transacted at Grand Forks station. Under the findings both the plaintiff and the defendant labored under the belief that the defalcation, which existed in fact, originated during the plaintiff's incumbency, and under such mutual belief the money sued for was paid over, and was so paid at the special instance of the plaintiff, and in furtherance of a plan of adjustment that plaintiff suggested, and which plan was adopted. The findings bring out the fact that the plaintiff, while in charge of the defendant's station, acting through Stewart, his servant and cashier, repeatedly

made collections of moneys due the defendant on current bills, and thereafter reported that such collections had not been made. The funds derived from such collections were, it is true, transmitted to the defendant, but in so doing a false report would be made to the defendant to the effect that the money so sent was derived from old and past-due collections and freight bills. These false and misleading reports, while fabricated by the cashier as a means of covering up his original embezzlements, were nevertheless the reports of the plaintiff. He is responsible to the company for their accuracy and truthfulness, and he is also responsible for any damages to the defendant resulting from such false reports. The findings are replete with the thought that it would have been not only possible, but practicable, and comparatively easy, for the plaintiff, within a few days after assuming his duties as station agent, and at all times thereafter during his term, to ascertain from the records in his office, and other sources of information to him accessible, whether there had been any defalcations on the part of his cashier, occurring before November 1, 1894, or at any time thereafter. The weakness of the plaintiff's case arises chiefly from his gross neglect in the matter of personally investigating the collections in his charge as station agent, and especially his neglect to personally examine and understand the reports made to the defendant, which were gotten up by his cashier, and for the accuracy of which he was responsible to the defendant. While it was not expected that the plaintiff would personally attend to all details appertaining to collections from consignees, or to the reports thereon required to be made to the defendant, he was, nevertheless, personally bound to account to the defendant, not only for all the collections actually made, but equally for the truthfulness of the reports sent in to the defendant of such collections. The findings show that either the plaintiff or his cashier, after November 1, 1894, collected over $1,000 of current collections, and remitted the same to defendant, but falsely reported to the defendant that said collections were made upon accounts due prior to November 1, 1894. The practical result of sending in these false and misleading reports is succinctly stated by the court below as follows: "Had the plaintiff, in compliance with the rules of the company, and his duties in the premises, ascertained and reported these facts at any time with six months after November 1, 1894, the defendant might have reimbursed itself for that portion of the defalcation embezzled prior to November 1, 1894, upon the bond of the predecessor of the plaintiff, who was the agent of the defendant prior to November 1, 1894, and who was also bonded for a similar amount in the Guaranty Company of North America; but after the expiration of said six months after November 1, 1894, it became impossible for the defendant to do so by reason of the limitation of said bond." From this finding it is clear that the defendant, on account of the gross negligence of the plaintiff in the matter of his said collections and reports, actually lost a valuable legal right, viz: that of indemnity on the bond

of plaintiff's predecessor for defalcations which occurred at said station prior to the period of plaintiff's term as such station agent. At the time the plaintiff paid over to the defendant the money he is here seeking to recover, there was an existing loss, resulting from a defalcation at said station. It was inevitable that some one should bear the burden of the loss. Assuming that plaintiff was equally innocent with the defendant, and that he paid the money over under the mistaken idea that the defalcation occurred during his own administration, the fact remains that no loss whatever would have resulted to the defendant or to the plaintiff but for the plaintiff's own negligence in the premises. Under such circumstances, money paid under a mistake of fact cannot be recovered. At and long prior to the time of paying over the money the plaintiff had the means in his own hands of ascertaining all the facts concerning the defalcations and concerning the various reports bearing upon the subject-matter of the collections. He neglected to make the necessary investigation, and paid over the money without doing so. This negligence will defeat a recoverey, inasmuch as the parties cannot be placed in *statu quo.* See *Espy* v. *Bank,* 18 Wall. 604, 21 L. Ed. 947; *Boas* v. *Updegrove,* 5 Pa. St. 516; *Norton* v. *Marden,* 15 Me. 45; *McArthur* v. *Luce* (Mich.) 5 N. W. Rep. 451. As has been seen, the defendant, on account of the plaintiff's gross negligence and dereliction of duty, has been caused to lose its right to indemnify itself upon the bond of the former station agent. Under such circumstances we would regard it as a violation of the principles of natural justice to permit the plaintiff to recover. The defendant cannot be placed in *statu quo.* The principles laid down by this court in the cases cited below are, in our judgment, in point: *Bank* v. *Laughlin,* 4 N. D. 391 (opinion, pp. 404, 405), 61 N. W. Rep. 473; *Krump* v. *Bank,* 8 N. D. 75, 76 N. W. Rep. 995. The contention of the appellant's counsel that the defendant's auditor was derelict also, and that he should have discovered the irregularities in plaintiff's collections and reports, cannot, in our opinion, alter the fact of the plaintiff's primary responsibility to the defendant for his own long-continued neglect and its consequences. The defendant and its auditor were entitled to receive true reports from the plaintiff, inasmuch as such reports were the defendant's proper sources of information touching the business done by the plaintiff as station agent for the defendant.

We have examined the cases cited by appellant's counsel, and have carefully considered that of *Supreme Council Catholic Knights of America* v. *Fidelity & Casualty Co. of New York,* 11 C. C. A. 96, 63 Fed. Rep. 56, and consider it, as well as the other cases of appellant, not in point. That case was not a case to recover money paid under an alleged mistake of fact, and it is devoid of the element of the plaintiff's gross neglect resulting in defendant's loss of indemnity,—an element which is controlling of the case at bar. Upon the facts found and the law applicable thereto as laid down

in the cases cited, we shall be compelled to affirm the judgment below. All the judges concurring.