HENRY B. GREGORY ET AL. V. JOHN H. WENDELL ET AL.

*Sales on the corn-exchange—Gambling contracts—Produce brokers— Agency.*

The legality of a commercial transaction is a question of fact depending on the intent of the parties.

A contract good on its face is binding if either party meant it to be lawful or supposed that the other meant it to be so, and if it can be lawfully carried out without conflicting with any intent common to both when it was entered into.

If one of the parties to a bargain of sale contemplates an actual sale, the transaction may be perfectly valid irrespective of any illegal purpose entertained by the other.

A contract cannot be a gambling contract unless both parties concur in the illegal intent.

Where a commercial "operation" is a purely gambling transaction and understood to be so by both parties, neither can sue the other on it.

Where an actual purchase is contemplated and the parties act in good faith, the fact that speculation is the object is of no legal importance.

It is lawful to buy merchandise for future delivery even if at the time of purchase the seller has none to deliver.

Sales on the corn exchange, even for immediate delivery, do not necessarily contemplate the delivery of a specific lot, but only of the amount, kind and quality bargained for; but one who sells for immediate delivery must be ready to deliver on call, and if he disqualifies himself from so doing by selling to another, the original purchaser can claim damages for conversion, or repudiate the sale and demand the corn.

The court recognizes the commercial usage of buying and selling through brokers without looking beyond them to the original parties, whereby the brokers stand in the place of principals.

But a purchaser may elect to have the contract turned over to him instead of relying upon his broker.

A broker who makes a purchase with the understanding, and with the concurrence of the seller, that the contract is to be at once turned over to his principal, ceases his connection with it on payment of his commissions.

One cannot be forced to accept another contracting party in place of the one with whom he contracted.

Brokers who are paid a commission to buy goods are agents for those for whom they buy.

A produce dealer instructed a broker to bargain for corn deliverable some months later, and agreed to pay the broker a commission and receive and pay for the corn at the time of delivery. The broker had a like agreement to receive the corn from certain other brokers and they from the sellers. The first broker settled with his correspondents. *Held* that on tendering to the produce dealer elevator receipts for the corn, he had discharged his obligations, and if the dealer refused to receive the corn or the receipts, he could sell it to indemnify himself, and recover for any deficiency.

In delivering grain to a purchaser on 'change, it is sufficient to tender elevator receipts if it appears that the bearer could obtain the grain upon them.

A broker commissioned to buy corn did so, but finding the price rapidly going down, sold it for his own protection, and on the refusal of his principal to ratify the sale, replaced it, and tendered the elevator receipts. The principal refused to receive them, and the broker sold the corn. Both sales were made at a loss, and the broker sued his principal for damages. *Held* that in estimating damages, the first sale was immaterial.

A produce broker sued a dealer who had commissioned him to buy corn for future delivery, for refusing to receive the corn when tendered, and testified that while the expectation had been that the dealer would order a sale before the time for delivery, the broker had nevertheless expected to obtain title to the corn for delivery at the maturity of the contracts, if they were not sooner disposed of. *Held* that in the absence of any evidence of previous gambling transactions between the parties, it was not proper on cross-examination to ask the broker if on any such dealings he had ever received any corn.

Where an understanding was entered into at Detroit for the purchase of corn at Chicago, which was shown to have been immediately carried out at Chicago, it was *held* not to be necessary to put in evidence the telegrams by which the orders to purchase were communicated.

A purchase by a broker through his correspondent is sufficiently

shown in an action by the broker against his principal, by show-
ing that the broker had reported the purchase to his principal
and received his approval.

One must be understood to warrant the genuineness of a transaction
between himself and another, on which he leads a third person
to rely.

Error to Wayne. Submitted Jan. 30. Decided April 8.

ASSUMPSIT. Defendants bring error.

*Atkinson* & *Atkinson* and *J. Logan Chipman* for plaintiffs in error.

*Otto Kirchner* and *G. V. N. Lothrop* for defendants in error.

COOLEY, J. Defendants in error are produce brokers
and commission merchants in the city of Detroit, doing
business under the copartnership name of J. H. Wendell
& Co. Plaintiffs in error are dealers in produce, among
other things, at Owosso, Michigan, under the firm name
of Gregory & McHardy. In April, 1877, Gregory was at
the office of Wendell & Co. in Detroit, and made an
arrangement for the purchase by Wendell & Co. for
them, of twenty thousand bushels of corn on the Chi-
cago market, for delivery in June. In pursuance of this
arrangement the firm of Cooley & McHenry, produce
brokers in Chicago, were at once by telegraph, as is
claimed, directed to make the purchase, and they made
it on the same day, at a fraction over fifty-nine cents a
bushel. On the purchase, Wendell & Co. received from
Gregory & McHardy one thousand dollars for "margin,"
and the price, except as to this, remained unpaid. The
price of corn declined from the time of purchase, and
on May 18, Gregory & McHardy decided to sell, and the
Chicago brokers made sale at a net loss of $1,689.
Three days previous to this Wendell & Co. had bought
for Gregory & McHardy ten thousand bushels of corn
through Erskine, another broker, and on May 18th they

bought twenty thousand bushels through Cooley & Mc-Henry. These purchases were made at a little over fifty-four cents, for July delivery.

After these last transactions the price of corn continued to decline, and on May 21st Wendell & Co. wrote Gregory & McHardy a letter from which the following is extracted:

"GENTS:—We find on figuring up your Chicago deals that you are short of margins some $600, and this is after taking balance of account, and giving you credit for the two cars of wheat at about to-day's prices. Will you send a draft for the amount, or shall we draw? Our Chicago parties make prompt demands on us, and we in consequence have to keep dealers well up."

No reply was made to this letter, nor to a letter and telegram on the same subject, three days later. May 26th, without orders from Gregory & McHardy, Wendell & Co. sold the contracts for July delivery at a large loss. When this sale was reported to Gregory & McHardy, the latter placed the matter in the hands of their attorney, who under date of June 5th wrote Wendell & Co. as follows:

"GENTLEMEN:—I am instructed by Gregory & McHardy to say that as you have sold, according to your statement, the corn which you profess to have held for them, thus rendering it impossible for you to fulfill the contract on your part, they will treat it as at an end, and hold you responsible for the amount paid you."

Immediately, and on the same day, Wendell & Co. replied, addressing their reply to the principals:

"GENTLEMEN:—As you fail to notify us that you are satisfied with our action in making sale of the corn heretofore purchased by us for your account for delivery in July, you are hereby notified that we shall hold ourselves in readiness to deliver such corn to you at the time you become entitled to such delivery by the terms of your order to purchase."

At the same time they ordered the purchase of thirty thousand bushels of corn in Chicago for July delivery, and the purchase was made. July 2nd, 1877 Wendell & Co. caused Chicago elevator receipts for this amount of corn to be tendered to Gregory & McHardy at Owosso,

and demanded payment for the corn at contract prices, which was refused. They thereupon sold the corn at a net loss, measured by the May purchases, of $2,071.75, and seek in this suit to recover the losses on the two transactions, after deducting certain credits which are not now in question.

The controversy in the court below was mainly over two questions: *First*, Whether the transactions out of which the suit sprung were not mere gambling transactions, and therefore opposed to the policy of the law, and incapable of affording a ground of action; and *second*, Whether plaintiffs, by making sale of the July contracts in May, had not, as the letter to them of defendants' attorney assumed, put it out of their power to perform on their part, and thereby discharged the defendants. Certain collateral questions bearing upon these were also raised, and some questions of evidence which will be referred to further on.

Defendants in the court below undertook to establish that the transactions between the parties never contemplated any actual sale or delivery of corn; that the supposed contracts were in the nature of wagers on the rise or fall in the price of corn between the respective days of purchase and the times when the nominal purchasers would receive delivery if the contracts were performed; that the unexpressed purpose was that the contracts should be closed only by the payment of differences, and that for these reasons it was not, and was never intended to be a legitimate business transaction, but was wholly illegal and void.

Another branch of the same litigation was before this court at the October session thereof in 1878, and it was then declared that if these were purely gambling transactions, and so understood by both parties, neither of them could maintain an action against the other in respect to them. *Gregory v. Wendell*, 39 Mich., ——. A like doctrine was laid down in *Lyon v. Culbertson*, 83 Ill.,

33, and in other cases cited further on. But this court also held that if the parties contemplated an actual purchase of corn, and acted in good faith in making such purchases, the fact that speculation was the object was of no legal importance whatever. Mr. Justice Marston, who wrote the opinion, did not dwell upon this point, but the right to buy grain in the open market in the hope to profit by a rise in market value, is as plain as the right to buy wild lands or any other property, and required no elucidation or special examination at the hands of the court. Neither can any question exist that if one party to a transaction contemplates an actual purchase, or the other an actual sale, the transaction may be perfectly valid irrespective of any illegal views or purposes that may have been indulged by the other. This makes the question of the legality or illegality of a transaction, as we held in the former case, a question of fact depending on the intent; and as such it was treated by the parties on the trial of this case at the circuit.

If there is a right to purchase produce on speculation, it may be purchased for future delivery; and this, though at the time the seller may have none to deliver. *Cassard v. Hinman*, 1 Bosw., 207; *Ashton v. Dakin*, 4 H. & N., 867; *Brua's Appeal*, 55 Penn. St., 296; *Pixley v. Boynton*, 79 Ill., 351. But in this case it was denied that delivery was ever contemplated. The defendant Gregory testified that in the dealings with Wendell & Co. the transaction was talked about and understood as a mere speculation, to be closed up without the delivery of any corn under or because of the nominal purchases. Mr. Clark, on the other hand, the member of the firm of Wendell & Co. with whom the negotiations were had, testified that while the talk and expectation was that Gregory & McHardy would order the corn sold before the time for delivery came, yet that the plaintiffs expected to obtain title to the corn for delivery at the maturity of the contracts if not disposed of sooner. On cross-exami-

nation Mr. Clark was asked if he had ever, on any such dealings, received any corn. The question was objected to and ruled out. Had the question been allowed, and had a negative answer been given to it, it would have been said that the answer gave support to the evidence of Gregory, where it conflicted with that of Clark, since it must be altogether improbable that in this instance something different was contemplated from any thing which had ever taken place before. We are inclined to think, however, that the court was right in overruling the question. Had there been a series of gambling transactions between these same parties, and had the question related to them, it might have been proper, because the inference that a continuance of the like dealings was contemplated would have been legitimate and forcible. But there had been no such transactions; and it would be very dangerous to permit the previous illegal conduct of one party to be proved as the foundation for an inference that a new dealer contemplated the like illegality. On the face of the transaction the contract was perfectly good and lawful; it could not have been a gambling contract unless both parties participated in the illegality by uniting in the intent; and where apparently the contract is good, the right of either party to an enforcement cannot be taken away except by showing concurrence in the unlawful purpose. If either party meant it as a lawful and legitimate transaction, it must be held to be lawful and legitimate. If the purposes of defendants were to engage in genuine dealings in this instance, the right of Wendell & Co. to enforce the contract would be complete, even though they had never engaged in a like transaction before; for gamblers may make lawful contracts as well as others.

If a miller from the interior of Michigan were to go to Chicago and there request a produce broker who for a series of years has been engaged in gambling transactions in grain, to purchase for him ten thousand bushels of wheat for future delivery, contemplating at the time

an actual receipt of the grain for business purposes, would it be claimed that the broker, in defense to an action for non-delivery, might prove that he had never previously made delivery of grain so purchased, and thereupon argue that it must be inferred the parties contemplated no delivery in this instance? And if he might not give such proof in an action against him for non-performance, on what ground could the miller be suffered to give it, by way of defense to an action for refusing to receive the wheat when tendered? It seems to us that these questions require no discussion. The illegal intent that shall defeat the contract must be the common intent of both parties; and if either has a lawful and legitimate purpose in making the contract, or if he supposes the other to have, and contracts with him on that supposition, his right to recover upon the contract after performing or tendering performance must be clear.

If a contract on its face contemplates illegal dealings, no question of intent can be open as a question of fact. But this contract was not one of that sort. It was perfectly legitimate on its face, and apparently contemplated nothing which was opposed to any principle or policy of the law. Now, if such a contract is susceptible of being carried out in a lawful way, without conflicting in any manner with any common intent which is shown to have been indulged or held by the parties at the time the contract was entered into, we discover no ground on which it can be held to be invalid. It is not enough to defeat it that it is susceptible of an illegal use, or that one of the parties to it may have contemplated and designed such illegal use, if the other had a right to suppose under the circumstances that the contract was to have effect according to its apparent and lawful construction. This is the view expressed in substance by the Kentucky Court of Appeals in *Sawyer v. Taggart*, Chicago Legal News for 1879, p. 133, in an able opinion by Mr. Justice Cofer.

In this case the parties were at variance respecting

what took place between them in the course of the negotiations preceding the contract, and the question in dispute upon their evidence was fairly submitted to the jury as one for their determination, and was found for the plaintiffs.   Upon the facts, therefore, the transaction is found not to be opposed to the policy of the law.

But the defendants further insist that, under the arrangement as sworn to by Mr. Clark, Wendell & Co. were their agents, and if as such agents they bought corn, it was their duty to make a valid agreement with some one, on behalf of their principals, for the delivery of corn;—an agreement in legal form and capable of being enforced against the actual vendor.   If they ever did make such an agreement, it is said, it must still be outstanding in the hands of the man with whom they or their correspondent made it, and it is to him that defendants must respond, and not to these agents.   A suit by Wendell & Co., whatever its result, could not bar the demand of an actual vendor against these defendants as actual vendees; and therefore under any view of the facts this suit is not maintainable.

The proposition that Wendell & Co. were to be regarded as agents merely, authorized as such to negotiate certain sales to these defendants, is one that at first blush seems unquestionable.   There is no doubt Wendell & Co. were agents: they were to buy *for* defendants, and they were to receive a commission for buying.   As agents they made purchases through Cooley & McHenry, which were entered on the books of the latter firm, and also through Erskine.   But this is not a complete statement of the case.   If defendants must have contracts with those who were the actual sellers, it is necessary to look further; for Cooley & McHenry and Erskine were only the correspondents of Wendell & Co., and bought for them of third parties.   There were thus two intermediate parties between the vendors and the vendees, and the ultimate parties were probably wholly unknown to each other.

The transactions were entered on the books of the intermediate parties, and as the evidence showed, they accounted to each other as debtor and creditor in respect to them. There is in all the evidence no intimation that the sellers looked for any purpose beyond the brokers who bought of them, namely, Cooley & McHenry and Erskine, or that defendants looked or expected to look beyond their immediate brokers, Wendell & Co. The intimation that Wendell & Co. were agents exclusively, and had not fully performed their duty as such until they had presented actual contracts with actual sellers, is evidently not in accord with the understanding of the parties.

No doubt the transaction may assume such a phase that the broker must be regarded as an agent merely. If he merely makes the purchase with the understanding, expressed or implied, that the contract is to be at once turned over to his principal, and this is done with the knowledge and consent of the seller, the broker's connection with the transaction will then have ceased, and if his commissions are paid, the principal will no longer have claims upon him in respect to it, nor he upon the principal. The buyer and seller will then be relieved of intermediate parties, and must look to each other exclusively for the performance of their respective obligations. And no reason is perceived why, at the election of the purchaser, the transaction may not be made to assume this form in every instance. As a matter of course in such case, the seller, when turned over to a purchaser who may be unknown to him, would be entitled to demand full payment at once, or to be protected by payments as "margins" or otherwise, in ways that he might not have required of the broker through whom the transaction was effected; but if payment is made or the demanded protection given, he cannot object to being turned over to the purchaser himself as the person with whom he must subsequently deal.

But this is not the phase the transaction commonly

40 MICH.—56.

assumes. The dealings are generally left in the hands of the broker himself until the transaction is fully closed, and we hazard nothing in saying that under such circumstances the buyer and the seller never have an understanding that they are to look to each other as the responsible parties, and not to the intermediate brokers. The buyer in the interior of Michigan knows nothing about the broker in Chicago, and does not trouble himself with the question of his responsibility. He goes to his own broker, in whose responsibility he has confidence, and deals with him, expecting that he will see to the closing up of all transactions. He would be somewhat astonished if his broker were to say to him: "My Chicago correspondent has made a purchase for you from some broker I do not know, and I will take your money and deliver to you in place of it the agreement of this broker that he will deliver you corn upon it at a future day. He may fail, but if he does, that is your loss, not mine." Few men would choose to speculate in produce on such terms, and fewer still of the millers in Michigan would purchase grain for future delivery, in Chicago or elsewhere, as they do on occasion now.

The implied understanding in all cases where the purchase and sale is intrusted to the broker is, that the purchaser looks to his broker, the broker looks to his correspondent, and the latter looks to the party who sells to him. If one desires to purchase grain for future delivery, his broker orders the purchase, but the transaction is represented on the books of dealers, and not by written contracts. The purchase now, when the grain is to be delivered in the future, is not for the purpose of having the quantity set apart to await the time, but it is to fix the price which the purchaser is to account for when the transaction is closed. It is never expected that during all the time intermediate the day of purchase and the day of delivery an amount of grain corresponding to the amount bargained for, will lie in the ware-

house awaiting the maturity of the contract; but the transaction, though called a purchase, is rather an agreement for future delivery, which the broker is to see is settled when the time arrives, unless it shall previously be disposed of under the orders of his principal. The cases in which vendors and vendees elect to relieve the transaction of intermediate parties and look to each other exclusively, must be altogether exceptional.

If a buyer for future delivery must be understood as dealing with the party who sold to his broker's correspondent, then defendants were consistent and logical in insisting, after Wendell & Co. had sold the July contracts without orders, that no other contracts could be substituted for those so disposed of. No man can be compelled against his will, to accept another contracting party in place of the one he has dealt with, even though a contract with such other party may be equally valuable, and in its results exactly the same. But it cannot seriously be pretended that these defendants expected and understood they were to look to all the several parties from whom Cooley & McHenry and Erskine had bought corn on their account, instead of looking to Wendell & Co., in whose hands they had left the dealings. While they might have required actual contracts from actual sellers, they chose, instead of doing so, to deal exclusively with the parties they knew. And under these circumstances Wendell & Co., who had assumed responsibilities and paid out moneys in carrying out their directions, were entitled to complete the transaction at the proper time by making delivery.

It is said that this view puts the plaintiffs in antagonistic positions; that it makes them buyers as agents for defendants, and sellers as principals to defendants of the same property; but this is not strictly accurate. They indeed bought as agents, but for their own protection they had the right to make delivery on the purchases, and the implied undertaking of defendants was to receive

delivery at the maturity of the contracts unless before that time they disposed of their purchases.

Had the purchases of corn been for immediate delivery, it would then have been the duty of plaintiffs to put themselves in position to make immediate delivery when defendants called for it,—not that they would have been obliged to deliver exactly the same corn which they had bought for defendants (*Nourse v. Prime*, 4 Johns. Ch., 490: s. c. 7 Johns. Ch., 90; *Horton v. Morgan*, 6 Duer, 56: s. c. 19 N. Y., 170), but they must deliver, or hold themselves in readiness to deliver, an equal quantity of the same in kind and quality. Had they under such circumstances disqualified themselves by sales from delivering the requisite quantity on demand, the purchasers might either treat this as an unlawful conversion of their property and claim damages, or they might repudiate the sale and demand the corn. *Taussig v. Hart*, 58 N. Y., 425. In the case now before us the defendants neither affirmed the sale made on May 26th nor repudiated it, but they planted themselves on the ground that the sale rendered it impossible for plaintiffs to complete the contract, and therefore discharged the purchasers from all obligation. This of course assumes either that defendants were entitled to particular lots of corn,—which cannot for a moment be pretended,—or to particular contracts for the delivery of corn; and if we are right in what has already been said, this last position is equally untenable with the other. No more depended on identity in contracts than on identity in kernels of corn. Wendell & Co. having bargained for the future delivery of corn to defendants, under their instructions, and having incurred liabilities in so doing, were entitled to require of defendants the fulfillment of the contract on their part; in other words, were entitled to require them to accept delivery and make payment.

Complaint is made of the rule of damages laid down

by the court in respect to the refusal of defendants to receive delivery of the corn tendered to them in July. It was said that as plaintiffs sold out the July corn in May, their damages must be the difference between the purchase price and the price then obtained. But as that sale did not bind defendants, and they refused to recognize it as one made on their behalf, plaintiffs were compelled, for their own protection, to put themselves in position to fulfill in July, and when they did so by a new purchase, the May sale became wholly immaterial.

Of as little force is the objection that the elevator receipts, which were tendered to defendants at Owosso, were not shown to have belonged to plaintiffs. The evidence was satisfactory that they were such receipts as the corn would have been delivered upon, had the bearer presented them. The defendants could demand nothing more.

The substance of the arrangement between these parties may be stated in few words. Plaintiffs were to bargain for a certain quantity of corn at the then ruling prices in Chicago, deliverable there in July following, and defendants were to pay them a commission for making the purchase, and also to receive the corn and pay the price at the time of delivery, unless they should dispose of the contracts sooner. Plaintiffs had a like agreement to receive the corn from Cooley & McHenry and Erskine, and these persons from those of whom they bought. It was shown by the plaintiffs that they settled for the purchases with the brokers with whom they dealt, and when they then tendered to defendants receipts representing the requisite quantity of corn in the elevator at Chicago, they had done all that the arrangement required of them, and if defendants refused to receive the corn, or the receipts representing it, plaintiffs were entitled to sell it for their own indemnity and to recover for any deficiency.

Some subordinate questions growing out of rulings in

the receipt of evidence require brief notice. As a part of the evidence of actual negotiations between the parties in Detroit, and of actual purchases by Cooley & McHenry in Chicago, made for plaintiffs on account of defendants, certain messages which had been delivered to plaintiffs, and which purported to be telegrams which had passed between the parties in Chicago and Detroit, were produced and received in evidence under objections. The objections to some of them were that they were not originals, and that even if they were, they could not prove purchases and sales, but would be mere hearsay. Of one it was said there was no evidence that it was ever sent; the proof being merely that it was taken to the telegraph office and delivered to an operator. But so far as these telegrams related to the transactions between Wendell & Co. and Cooley & McHenry, they seem to us unimportant. Independently of them it was shown that after plaintiffs and defendants came to an understanding at Detroit as to what should be done in the purchase of corn at Chicago, the understanding was immediately carried out by Cooley & McHenry at the place of contemplated purchase, in pursuance of supposed instructions. This was the important fact; and even had it turned out that the supposed telegrams were mere copies, that circumstance would in no way affect the purchase. The substantial fact would remain that purchases and sales were made in pursuance of the arrangements, and for which there must in some form have been directions.

The purchase of ten thousand bushels of corn on May 15th for July delivery was supposed to have been made through Erskine. The evidence of his having made the purchase consisted in what purported to be a telegram announcing it, and two letters in which he notified Wendell & Co. that he had drawn drafts on account of that and other purchases. It might perhaps be a serious question whether these, standing alone, would establish the fact that such a purchase was made; but as plaintiffs immediately reported it, with price, to

defendants, and received in reply a letter of approval, a contract between them was sufficiently made out. Plaintiffs must be understood to warrant the genuineness of a transaction between themselves and their correspondent, on which they lead another party to rely; and had defendants called upon them to turn over a valid contract, or to deliver the corn at the proper time, they would not have relieved themselves from responsibility by showing that the telegram was fictitious. And if they were bound, so were the defendants.

We find no error in the record, and the judgment must be affirmed with costs.

The other Justices concurred.