Williams, J.
The evidence tends to prove the facts found by the district court; and, as this court is not required to determine the weight of the evidence, the facts so found, will, in the disposition of the case, be regarded as established by the •evidence. The case, shown by these facts, and those admitted by the pleadings, is, that Kahn who was a commission broker in Cincinnati, doing business with, and for Ream & Co., brokers and commission merchants in Chicago, bought of, or through them wheat and pork for future delivery, so called, on Walton’s account. The transactions were mere speculations, or ventures on the prices of the commodities named, without any intention on the part of the parties concerned, that the property should either be delivered, or paid for; but all the parties understood, and intended that settlements should be made between them," on the differences between the market prices, at the dates fixed for delivery, ■and those named in the contracts. Kahn was to have a commission for his services, and he advanced margins on the deals. Walton was loser, and drew his two checks, amounting to two thousand dollars, on the bank where he had funds, payable to Kahn, for moneys paid by him on the deals and losses. Walton also paid Kalm five hundred dollars in money on the same account. Kahn telegraphed to the bank, inquiring if Walton’s checks for the amount of those drawn to him were good, and received an affirmative answer.
Walton notified the bank not to 'pay the checks, and before their presentation, brought his action to enjoin their payment.
I. Upon this state of case, the first inquiry naturally is, were the speculative transactions in which the parties engaged, in the nature of wagers, and for that reason illegal? In the ■determination of this question it is not deemed material *204 whether they fall within the provisions of our statutes against gaming and wagering, or do not; for, it is generally held in. this country, that wagering contracts, though not prohibited by statute, are illegal, and void as against public policy. And the great weight of authority is to the effect, that, contracts of the kind the district court found those involved in this case, to be, are void as wagering agreements.. This has been held by the courts of last resort in every state where the question has been presented, and by the-Supreme Court of the United States. The rule generally accepted is, that contracts for the sale of personal property to-be delivered in the future are valid, if the parties really intend and agree that the property is to be delivered by the-seller, and the price is to be paid by the purchaser, though the seller have not the goods, nor any other means of getting-them, than to go into the market and buy them. But if the-real intent be merely to speculate on the rise and fall of prices,, and the goods are not to be delivered, but one party is to pay to the other the difference betweeen the contract price and the-market price of the goods at the date fixed for executing the-contract, then the contract partakes of the nature of a wager and is void. Irwin v. Williar, 110 U. S. 499; Higgins v. McCrea, 116 U. S. 671; Man v. Bishop, 136 Mass. 495; Gregory v. Wendel, 40 Mich. 432; Cole v. Milmine, 88 Ill. 349; Kingsbury v. Kirwan, 77 N. Y. 612; Lowry v. Dillman, 59 Wis. 197.
II. The facts found by the district court, plainly defineKahn’s relation to the unlawful agreements. He was directly connected with them; and with full knowledge of their character, performed services and expended money to promote and forward them. It was his intention, as well as the intention of the other parties, that the property should not be delivered,, or paid for, but that the differences in the prices should be adjusted in money. It is true, Kahn was the broker, and had no pecuniary interest in the business except his commissions, and the repayment of whatever sums he might advance for margins and to pay losses as the business progressed. He- *205 nevertheless, negotiated the wagering contracts and was party to them.
The legal effect of . such relation to contracts of that nature, was determined in the case of Irwin v. Williar, supra. The conclusion of the court is thus stated: “ In Roundtree v. Smith, 108 U. S. 269, it was said that brokers who had negotiated such contracts, suing not on the contracts themselves, but for services performed and money advanced for defendant at his request, though they might under some circumstances be so •connected with the immorality of the contract as to be affected by it, they are not in the same position as a party sued for the •enforcement of the original agreement. It is certainly true that a broker might negotiate such a contract without being privy to the illegal intent of the principal parties to it which renders it void, and in such a case, being innocent of any violation of law, and not suing to enforce an unlawful contract, has a meritorious ground for the recovery of compensation for services and advances. But we are also of the opinion that when the broker is privy to the unlawful design of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is particeps criminis, and can not ■recover for services rendered or losses incurred by himself in behalf of either in forwarding the transaction.” We accept this as a sound and wholesome rule, and under its operation, the checks, given by Walton to Kahn, for services rendered and losses paid by him in the unlawful enterprise, are tainted with the vice of their origin, and are subject to all the infirmities of securities given for illegal considerations.
III. It is contended, that the drawing of the cheeks by Walton on the bank where he had sufficient funds to pay them, and the bank’s response to the inquiry of Kahn’s agent, that checks to their amount were good, was a specific appropriation •of the fund, and amounted to payment of the debt for which they were drawn ; whereby the' contract became fully executed.
A check, being simply a written order of a depositor to his banker to make a certain payment out of his funds’, is executory, and, of course, revocable at any time before the bank has paid it, or committed itself to its payment. It operates, it is *206 true, as an assignment of the fund on which it is drawn pro■ tanto, and binds the bank to its payment out of the fund when presented, unless revoked; but, it is not itself payment of the debt for which it is drawn, unless it be so agreed between the parties. Ordinarily it is only a means of payment, and the debt is not extinguished, unless and until the check be paid, or the holder be guilty of laches which may opei'ate as a discharge of the drawer. The bank is the agent of the drawer. Its duty is to pay his money as he directs. It owes no duty to the holder, except under the drawer’s directions, until by virtue of those directions it assumes some obligation to the holder. Up to that time the latest order from the drawer governs. But after the bank has paid the check, or placed itself under an obligation to pay it, the drawer’s power of revocation is ended. This obligation may be incurred by acceptance. It is sometimes said that the legal effect of the acceptance is to place the holder of the check in the position of a depositor. By the acceptance a new and specific engagement is entered into by the bank, which is, to unconditionally pay the sum named to the legal holder of the check. The acceptance or certification is sometimes evidenced by writing the word “good” on the check by the authorized officer or agent of the bank; but no particular mode or form is necessary, and it is generally held that a verbal acceptance is sufficient. But. whatever the mode or form employed, there must be enough to indicate the acceptance of the particular check.
It is manifest there was no acceptance, or certification of the checks in question in this case. The telegraphic correspondence between the bank and Kahn’s agent amounted to no more than ah assurance that valid checks to the amount stated, drawn by Walton, or that might be drawn by him, were then good. No particular checks were mentioned in the inquiry, nor any intimation given that the enquirer had received, or was about to receive such checks; nor had the bank any means of identifying the checks to which the inquiry related. Its telegram, therefore, did not commit the bank to the payment of any particular check. At most, it was information that Walton had, at its date, money on deposit to the amount stated, subject to-
*207 check. Espy v. Bank, 18 Wall. 604. If, therefore, before the checks were presented for payment, and before they were certified or accepted by the bank, or it otherwise became committed to their payment, Walton revoked them, and notified the bank not to pay them, as he claims, and as the district court found he did, his defensive remedy at law would appear to be adequate.
TV. But what standing has the plaintiff in a court of equity ? The transactions upon which he founds his claim for relief were unlawful; and the remedy he seeks, is protection against the consequences of his own participation in them. In such cases, equity keeps its hands offj and leaves the parties where it finds them. It is a fundamental rule of equity, that parties wanting its aid, must come with clean hands. Courts of equity require honesty, good faith and legality in transactions between men ; and if a party would pursue his remedy therein, his demand must not rest on a violation of law for its foundation, or arise from his own illegal acts, or conduct contra bonos mores. 1 Waite’s Actions and Def. 153; 3 Ibid. 685. It was said by Lord Mansfield in Holman v. Johnson, Cowp. 341, that “ No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiff’s own stating, or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says, he has no right tó be assisted. It is upon that ground the court goes ; • not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to biúng his action against the plaintiff, the latter would then have the advantage of it; for when both are equally in fault, potior est conditio defendentis.” In Atwood v. Fisk, 101 Mass. 363, which was a bill in equity to compel the surrender and cancellation of a note, and mortgage given to secure its payment, on the ground that the consideration for them was illegal, the court in denying the relief sought by the bill, declares it to have long been settled, !< that the law will not aid either party to an illegal contract to enforce it against the other, neither will *208 it relieve a party to such a contract who has actually fulfilled it, and who seeks to reclaim his money or whatever article of property he may have applied to such a purpose. The meaning of the familiar maxim, in pari delicio potior est conditio defendentis, is simply that the law leaves the parties exactly where they stand ; not that it prefers the defendant to the plaintiff, but that it will not recognize a right of action, founded on the illegal contract, in favor of either party against the other. They must settle their own questions in such eases without the aid of the courts.”
The statement of the rule by Chancellor Walworth in Harrington v. Bigelow, 11 Paige 349, may be applied directly to this case. He says : “ where both parties have been engaged in an illegal transaction, the court will not lend its active aid to the one party to get rid of the securities taken upon the illegal transaction, nor will it aid the other party in retaining them; but will leave both to their strict technical rights.”
In Weakley v. Watkins, 7 Humph. 356, it is held that “ a ■court of chancery will not entertain a bill to cancel an obligation, the consideration of which is a violation of chastity, the compounding of a felony, smuggling, gaming, false swearing, or the commission of any crime, or a breach of good morals.” This was a bill in chancery filed by Weakley against Watkins and Ferguson, to obtain the cancellation of a note under •seal executed upon a gaming consideration. A demurrer was filed to the bill, and the court in the opinion says : “ It is true that a court of chancery, upon the principle of quia timet, will order said instruments to be delivered up and cancelled. But this is when the complainant has been imposed upon, and •executed an instrument void, for fraud, accident, mistake or other cause, which renders it iniquitous and unjust that it should be enforced against him, and when in the execution of it, he has himself been guilty of no violation of law or good morals. But this principle has never been held applicable to instruments knowingly executed in violation of good morals, •or express prohibition either by common or statute law. For instance, no court of chancery will entertain a bill to cancel an obligation, the consideration of which was a violation of *209 ■chastity, compounding a felony, the smuggling of goods in violation of the revenue laws, gaming, false swearing, etc.; •and this for very obvious reasons. The complainant shall not be permitted to charge himself with crime, and obtain relief out of it; and because public policy requires that the execution of all such contracts shall be discouraged; which can not be more effectually done, than by repelling all actions upon them in courts of justice. . In contracts of the kind now under ■consideration, we have held that they are inoperative and void, as contrary to good morals and positive enactment, and that as such, they are not fit subjects for the action of 4 court; it is true that in all the cases we have heretofore had, the .attempt has been to enforce them ; but we can see no difference in the position of the winner and loser, so far as to their right in becoming active movers upon such contracts in the courts ; “the one seeking to enforce them by the judgment of a court ■of law, the other, seeking by the aid of a court of chancery to have them delivered up and cancelled; they are equally repelled upon reason and authority.”
It was said by this court in Roll v. Raguet, 4 Ohio, 400, that “ whenever the agreement appears to be illegal, immoral, or against public policy, a court of justice leaves the parties as it finds them; if the agreement be executed, the court will not rescind it; if executory, the court will not aid in its execution.” This was again held in Raguet v. Roll, 7 Ohio, pt. 1, p. 77. And see Raguet v. Roll, 7 Ohio, pt. 2, p. 70. The doctrine of these cases has recently been approved and ■enforced by this court. McQuade v. Rosecrans, 36 Ohio St. 442; Williams v. Englebrecht, 37 Ohio St. 383.
And in Thomas v. Cronise, 16 Ohio, 54, it is laid down as “ a universal principle, both ■ in law and equity, that where an agreement is founded upon a consideration illegal, immoral, or against public policy, a court will leave the parties where it finds them.”
In Hooker v. DePalos, 28 Ohio St. 251, the same doctrine is announced in the following language : “ The maxim ‘ ex turpi eausa, non oritur aetio,’ is an old and familiar one, rest *210 ing on the clearest principles of public policy, and never to be ignored. In accordance with this maxim, nothing is better settled than that, in regard to contracts which are entered into for fraudulent or illegal purposes, the law will aid neither party to enforce them whilst they remain executory, either in whole or in part, nor, when executed, will it aid either parly to place himself in statu quo by a rescission, but will, in both cases, leave the parties where it- finds them. It is true that particular statutes have been, from time to time, enacted in this state as well as in many of our sister states, which are, to some extent, in contravention of this common law doctrine. The statutes of this state, which allow money won by gaming or betting to be recovered back by the loser, furnish an example of this kind. ; But such statutes are a recognition of the established rule that no recovery could be had in such cases at common law; they are exceptional in their character; are in derogation of the common law; and therefore are to be construed strictly, and not extended by implication beyond the particular eases of illegality for which they provide.” The statutes adverted to, change the common law so far as to give the loser the right to recover back what he has lost, and provide a remedy therefor, but no farther; In all other respects the common law governs. Whether these statutes have any proper application to contracts like those under discussion, need not now be decided; for if it be granted that they have, yet, since they make no provision for equitable actions for injunctions, the right to such remedy must be determined by considerations independent of the statutory regulations. Veach v. Elliott, 1 Ohio St. 139; Thomas v. Cronise, supra.
The legislature, apparently recognizing the inapplicability of the statutes theretofore in force to such contracts and transactions, enacted that of May 4, 1885 (82 Ohio L. 254), which declares all contracts for the sale of grain, provisions and other specified articles, when there is no intention to deliver, or pay for, the articles sold, to be void; and makes them gambling and criminal acts. This statute having been passed after the contracts between these parties were made, of course cannot affect the decision of the case. And if it were otherwise, they *211 do not confer upon the plaintiff the right to maintain the action prosecuted by him.
Precisely what effect has been given the English statutes, in the decisions of the courts of that country upon this subject, is not very clear; it is nevertheless true that parties to gaming securities, were there expressly authorized by statute, to go into chancery for discovery, which gave ground for the application of the familiar rule, that a court of chancery having jurisdiction for one purpose, will retain the case for final relief. In the case of Rawden v. Shadwell, 1 Ambler, 268, which was a bill for discovery, and the cancellation of a bond given for money won at gaming, the report states that Lord Hardwicke decreed with great clearness, and said, by Stat. 9, Anne, “ all securities for money won at play, are made void, consequently the payment, under any security, can not be supported; ” and Baker v. Williams is referred to in the report as an authority for the decree. In the note to the case it is said that the Statute of 9 Anne gives leave to come into a court of chancery for a discovery; and Sir J. Jeckyll, Master of the Rolls, in the note citing Baker v. Williams, said: “ and if it (the note) was put in suit at law, no doubt but the party might make a defense against it under the act; but that is no objection against coming into this court (chancery), for as the person giving the note is entitled to a discovery here, it could not be the intention of the legislature, that after the discovery, he should be sent to another court for relief; so it is, that upon a discovery of assets, the court grants relief, without sending the party to law.” And it may be noticed that in Woodson v. Barrett, 2 Hen. & Munf. 88, the Supreme Court of Virginia followed Rawden v. Shadwell, under a statute which was an exact copy of 9 Anne, except that the word “contract” was inserted in it, which was omitted in the Statute of Anné. And the case is followed by the same court in Skipwith v. Strother, 3 Rand. 216.
In this respect the Statute of Anne differs essentially from ours. The only actions provided for by our statute are the purely legal ones, to recover back the money lost, and for the conversion of the goods won of the plaintiff. No suit in *212 equity is authorized or contemplated. The provision of the statute that the plaintiff may annex to his petition in the legal actions it permits, interrogatories' for discovery, at once removes the necessity and cause for recourse to equity ; and the statute which created the right/ having specially prescribed the legal remedies mentioned, and none other, they must be deemed exclusive.
It can not be denied, however, that courts have differed in the application of these kindred maxims, “ ex turpi causa non oritur actio,” and “ in pari delicto portior est conditio defendentis”; especially to gaming securities, which, it has been held by some courts, are so far excepted from the operation of the maxims that equity will decree them to be surrendered and cancelled. The reasons given for so holding are that “ the circulation of gaming bonds, is no less to be discountenanced than the giving of them, and no means are more likely to prevent the giving of them, than to put an effectual stop to their circulation; ” and, that because the losers are permitted to defend against securities given by them, on the ground that they were given for a gaming consideration, courts of equity should entertain suits for their cancellation.
These appear to be arguments, not so much in favor of the asserted exception, as against the maxims themselves; for it is apparent that the same reasoning, would in the same measure, exclude from their operation every contract and security founded upon any other illegal consideration. The circulation of all bonds and securities given for any illegal or immoral consideration, is quite as much to be discountenanced as the giving of them; gaming bonds and securities, no more than others; and, if putting a stop to the circulation of gaming bonds, by a resort to a court of equity to compel their surrender and cancellation, be the most effective means of preventing the giving of them, then the same means should be permitted and adopted, and for the same reason, to accomplish the same end, with regard to bonds and securities given for any other illegal consideration. And, if, because parties may defend against securities given by them, on the ground that they were given for a gaming consideration, is a valid reason why a court *213 of equity should entertain a suit for the cancellation of such securities, it is an equally valid reason why that court should entertain suits for the cancellation of instruments founded upon any other illegal consideration; for such consideration may also be made a ground of defense to them. Such is the logical result of the argument in favor of the exception contended for. And some English cases have gone to that extent. In Neville v. Wilkinson, 1 Bro. Ch. R. 547, Lord Chancellor Thurlow is reported to have said, “ that in all cases where money was paid for an unlawful purpose, the party, though partieeps eriminis, might recover at law; and that the reason was, that if courts of justice mean to prevent the perpetration of crimes, it must be by not allowing a man who has got possession to remain in possession, but by putting the parties back to the state in which they were before.” But Mr. Justice Story, referring to the words of the Lord Chancellor, says: “this is pushing the doctrine to an extravagant extent, and effectually subverting the maxim, ‘In pari delicto potior est conditio defendentis.’ The ground of reasoning upon wdiich his lordship proceeded is exceedingly questionable in itself; and the suppression of illegal contracts is far more likely in general to be accomplished, by leaving the parties without remedy against each other, and by thus introducing a preventive check naturally connected with a want of confidence, and a sole reliance upon personal honor. And so accordingly the modern doctrine is established.” 1 Story’s Eq. Jur. sec. 298. The difference between the earlier cases, and the current authorities on the subject, is pointed out in the following note to this section: “I say, at present; for there has been considerable fluctuation of opinion, both in courts of law and equity, on this subject. The old cases often gave relief both at law and in equity, where the party would otherwise derive an advantage from his iniquity. But the modern doctrine has adopted a more severely just and probably politic moral rule, which is, to leave the parties where it finds them, giving no relief and no countenance to claims of this •sort.” Mr. Bispham, in his “Principles of Equity,” sec. 223, says: “ The rule, both at law and in equity, in regard to gambling transactions, now seems to be that the courts will not only *214 refuse to lend their aid for the purpose of enforcing such contracts, but they will not assist the losing party in setting the contracts aside or recovering back the money paid. The maxim applicable to such cases is “potior est conditio possidentis.” _ The opinion of the Supreme Court of Massachusetts, in the case of Atwood v. Fisk, before cited, is to the same effect. It is there stated as the prevailing doctrine, that “ the suppression of illegal contracts is far more likely in general to be accomplished by leaving the parties without remedy against each other. And so the modern doctrine is established that relief is not granted’where both parties are m pari delicto.”
A review of all the authorities would occupy much space, and be of little practical value.
The test for determining when the objection that the parties are in pari delicto can be sustained, is whether the plaintiff can make out his case otherwise than through the medium, and by the aid of the illegal transaction to which he was himself a party; and when applied to this case,’ is conclusive against, the plaintiff. He asserts that he knowingly entered into an unlawful engagement; one contrary to good morals and against public policy. He entered into it with knowledge that either he, or the other party must lose, and with the intention of reaping the fruits of.his unlawful venture if he should prove to be the winner. His expectations were disappointed. He lost, paid part of the loss, and for the purpose of making further payment drew his checks on a bank in which he had sufficient funds on. deposit to pay them. These checks he delivered to the winner, or his agent, and having gone thus far, he appeals to a court of equity to interfere in his behalf, and interpose its extraordinary aid by injunction to stop their payment. After he lost, he might have refused further to act, and still be safe; and if by giving the checks the other party has acquired an advantage over him, it results from his voluntary act in the execution of his illegal enterprise. We fail to preceive how, to relieve parties in cases like this, from the consequences in which their own wrongful conduct has involved them, would tend to discourage such adventures, promote good morals, increase re *215 spect for the law, or accord with a sound public policy. In reaching this conclusion, we have not overlooked the rule that a party, who advances money upon an undertaking or agreement to do an act that is illegal, immoral or against public policy, may, at any time before the wrongful act is done, and while the agreement or undertaking remains wholly unexecuted, repent and retract. He may wholly rescind the contract, prevent the act from being done, and recover back. The law encourages such repentance and abandonment of the unlawful undertaking, and will aid the party, because it tends to prevent wrongdoing. But to be efficacious, the repentance must be timely; and it comes too late after the unlawful act has been done and the undertaking in whole or in part performed. Then thá law will assist neither party in its further execution, nor to undo what has been done in its execution. Hooker v. DePalos supra.

Judgment reversed and petition dismissed.