*In re* LEAN'S ESTATE.

E. B. CADWELL & CO. *v.* LEAN'S ESTATE.

1. CONTRACTS—BROKERS — GAMBLING TRANSACTIONS — ILLEGALITY OF SALE—STATUTES.

The purchase, through a brokerage firm, on Chicago exchange, by correspondents of such brokers, of wheat later sold at a loss, is not void as a gaming transaction, under 3 Comp. Laws, § 11373, unless the party endeavoring to enforce the contract intended that no delivery or receipt of, or payment for, the wheat should take place.

2. SAME—ESTATES OF DECEDENTS.

And, as against the estate of a deceased person who gave his note for the balance due on several such transactions, the testimony of claimants that they actually intended to buy and receive the wheat, uncontradicted and unimpeached, was conclusive of their right to recover.

Error to Wayne; Murphy, J. Submitted January 19, 1912. (Docket No. 123.) Decided March 12, 1912.

E. B. Cadwell and Howard Brooke, copartners as E. B. Cadwell & Company, presented a claim against the estate of Robert C. Lean, deceased, for certain moneys due on a promissory note of decedent. From a disallowance of the claim by the commissioners on claims, claimants appealed to the circuit court. Judgment for defendant. Claimants bring error. Reversed.

*Fred A. Behr, Chas. F. Delbridge,* and *Orla B. Taylor,* for appellant.

*Bowen, Douglas, Eaman & Barbour,* for appellee.

The claimants are a partnership engaged in the general brokerage business in the city of Detroit. During the year 1908, they made arrangements with a Chicago broker who had a seat on the Chicago board of trade, by means of which they were enabled to transact a brokerage business in grain. While this arrangement was in force, Robert C. Lean, against whose estate claim is now made, retained them as his brokers to buy and sell wheat for him on the Chicago board of trade. To secure his brokers, Lean gave to them a promissory note in the sum of $300, indorsed by a person satisfactory to them. Having taken this security, the brokers accepted and executed Lean's orders. The method of doing business was as follows: Lean would order his brokers to buy (or sell) for his account 5,000 bushels of wheat. This order was by the brokers transmitted to their Chicago broker, who executed it upon the floor of the board of trade and sent a confirmation of the execution of the order to Lean's Detroit brokers. Later Lean would order his brokers to sell (or buy) an equal amount of wheat, which order was executed in like manner. The two transactions would result in canceling each other, so far as the amount of wheat was concerned. But for the execution of these two

orders the Chicago broker charged Cadwell & Co., $6.25, which they in turn charged to Lean. So that if Lean bought and sold at the same figure he would still lose $6.25 on each 5,000 bushels bought and sold. If he was able to sell wheat at one-eighth cent per bushel higher than the price at which he bought, he would come out even; if at a greater advance, he would make money; but if at a less advance, he would lose. During the month of June, and up to July 6, 1908, Lean continued to trade through his brokers in the manner above described. His operations then ceased, and it was then found that he was indebted to Cadwell & Co. in the amount of $313.64. He thereupon renewed the initial note given by him and included therein the total amount of his indebtedness to them. Lean died August 17, 1909, and this note was duly presented by Cadwell & Co. to the commissioners on claims for his estate. An appeal was taken from their decision to the circuit court, where a trial was had which resulted in a disallowance of the claim. Claimants have now removed the case to this court for review.

BROOKE, J. (*after stating the facts*). The defense set up is want of consideration; the claim being that the note was given in consideration of a gambling debt. The defendant estate offered no testimony. The claimants, through one of the partners, testified that they acted as agents and brokers for Lean, and that each order of his, whether for buying or selling, was actually executed through their broker upon the floor of the Chicago board of trade, and that actual delivery of the grain bought or sold was contemplated by themselves and their agents. That the legal obligation to so receive or deliver followed each transaction is not open to question. There is no testimony in this record to indicate that Lean himself regarded these transactions as gambling contracts; and the testimony that the claimants and their Chicago agents did not so regard them is conclusive. To warrant the jury in reaching the conclusion which they did reach,

they must have found that, when the contracts were made, it was the intention of both Lean and the claimants to settle their differences upon the basis of the difference in the contract price and the market price at the time of settlement. This record is absolutely barren of evidence which would sustain such a finding. The mere fact that, after ordering his brokers to buy 5,000 bushels of wheat, Lean at a later date ordered them to sell a like amount, and repeated this operation from time to time, has no legitimate bearing upon the legal character of the contracts. Such contracts are made hourly upon the floor of every stock exchange in the country.

Section 11373, 3 Comp. Laws, makes the intention of the parties entering into the contract the controlling factor, and contracts are by that section made void only where there is no intention of receiving and paying for the property bought, or of delivering the property sold. This statement includes both parties to the contract, and the absence of intention on one side only, even if proven ( which it was not in the case at bar ), will not serve to avoid the contract. Section 11374, 3 Comp. Laws, defines the duties of brokers, and the record discloses that claimants carefully complied with all statutory requirements.

A clearer view may, perhaps, be obtained of the matter here in issue if we suppose that, instead of losing, Lean's operations through his brokers had shown a profit. Suppose Lean or his estate had brought suit for such profits, and the brokers had set up the defense that the contracts were of a gambling nature, and therefore void. Lean's answer to such a position would unquestionably be:

"It makes no difference to me what your intentions were in the premises. I gave you orders to make actual sales and purchases, which you have made for my account, and the resulting profits do not flow from a gambling transaction, but from the exercise by me of a wise business judgment in a series of actual purchases and sales."

We have lately held ( *Goodspeed* v. *Smith*, 162 Mich.

641 [127 N. W. 813]) that even the keeper of a bucket shop, who operates in direct violation of law, cannot set up in his defense that his contracts are gambling contracts, where the other party dealt with him in good faith and with the intention of actually receiving and paying for the stocks purchased.

The only meritorious question presented by the various assignments of error is whether the claimants were entitled to a directed verdict in their favor upon the evidence as it stands in this record.

Our views, as indicated above, find abundant support in the following authorities: *Gregory* v. *Wendell*, 39 Mich. 337 (33 Am. Rep. 390); *Id.*, 40 Mich. 432, and cases there cited; *Chicago Board of Trade* v. *Grain & Stock Co.*, 198 U. S. 236 (25 Sup. Ct. 637); *Ward* v. *Vosburgh* (C. C.), 31 Fed. 12; *Ponder* v. *Cotton Co.*, 100 Fed. 373, 40 C. C. A. 416; *Chicago Board of Trade* v. *L. A. Kinsey Co.*, 130 Fed. 507, 64 C. C. A. 669 (69 L. R. A. 59); *Cleage* v. *Laidley*, 149 Fed. 346, 79 C. C. A. 284; *Barnes* v. *Smith*, 159 Mass. 344 (34 N. E. 403).

Claimants were entitled to a directed verdict for the amount of the note and interest.

The judgment is reversed, and a new trial ordered.

MOORE, C. J., and STEERE, McALVAY, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.